960 A.2d 59

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Richard Scott BAUMHAMMERS, Appellant.**

Supreme Court of Pennsylvania.

Argued March 5, 2008.

Decided Nov. 20, 2008.

4

6

8

Francesco Lino Nepa, Michael Wayne Streily, Pitttsburgh, Allegheny County District Attorney's Office, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

Thomas Farrell, for Richard Scott Baumhammers.

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, MCCAFFERY, JJ.

## *OPINION*

Justice McCAFFERY.

This is a capital direct appeal from judgments of sentence imposed by the Court of Common Pleas of Allegheny County on May 12 and September 6, 2001. Because we conclude that the issues raised by Appellant are without merit, we affirm the judgments of sentence.

On April 28, 2000, during a crime spree lasting approximately two hours, Appellant, Richard Baumhammers, shot and killed Anita Gordon, Anil Thakur, Ji–Ye Sun, Thao Pak Pham, and Garry Lee. He also seriously wounded Sandip Patel, pointed his loaded pistol at George Thomas II, set fire to Mrs. Gordon's house by using an incendiary device, desecrated one synagogue by defacing it with red spray paint and shooting bullets into it, and desecrated a second synagogue by shooting bullets into it. Appellant was arrested on the day of the crime spree and was found to have in his possession a .357 caliber handgun, spent .357 caliber shell casings, live .357 caliber ammunition, two Molotov cocktails, a can of red spray paint,

14

and a roadmap. Appellant was charged with five counts of homicide, one count of attempted homicide, one count of aggravated assault, one count of simple assault, one count of recklessly endangering another person, eight counts of ethnic intimidation, two counts of institutional vandalism, two counts of criminal mischief, three counts of arson, and one count of carrying a firearm without a license. At the time of the filings of the criminal informations, the Commonwealth gave Appellant notice of its intention to seek the death penalty and of the aggravating circumstances supporting the death penalty on which it intended to rely.

Following a competency hearing held on May 9, 2000, the trial court determined that Appellant was mentally incompetent and ordered his transfer to a state hospital for treatment. Following a subsequent competency hearing held on September 15, 2000, the trial court determined that treatment had rendered Appellant competent to stand trial. A jury trial on the charges was thereafter held from April 27 to May 9, 2001. During trial, Appellant did not dispute that he had shot the victims; rather, he presented evidence that he had done so while suffering from a mental disease. The jury rejected Appellant's insanity defense and returned a verdict of guilty on the five counts of first-degree murder and on all of the remaining charges.

From May 10 to May 11, 2001, the penalty phase of the trial was held. The Commonwealth presented two aggravating circumstances pursuant to 42 Pa.C.S. § 9711(d)(7) and (11).[1] Appellant presented five mitigating circumstances pursuant to 42 Pa.C.S. § 9711(e)(1), (2), (3), (5), and (8).[2] The jury found

[1]. The two aggravating circumstances were as follows: "(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense;" and "(11) The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the same time of the offense at issue." 42 Pa.C.S. § 9711(d)(7) and (11).

[2]. The five mitigating circumstances were as follows: "(1) The defendant has no significant history of prior criminal convictions;" "(2) The defendant was under the influence of extreme mental or emotional disturbance;" "(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the require-

that the Commonwealth had proven the two aggravating circumstances, and that Appellant had proven three of the five mitigating circumstances. However, the jury also determined that the aggravating circumstances outweighed the mitigating circumstances and returned sentences of death as mandated by law. *See* 42 Pa.C.S. § 9711(c)(iv) (providing in relevant part that the verdict must be a sentence of death if the jury unanimously finds one or more aggravating circumstances that outweigh any mitigating circumstances). Sentencing on the non-capital offenses, as well as the formal imposition of the death sentences was deferred pending the preparation of a pre-sentence report. On September 6, 2001, the sentencing court formally imposed the five sentences of death and further imposed a total term of imprisonment on the non-homicide convictions of 112½ to 225 years. On December 29, 2005, the court denied Appellant's post-sentence motions, and Appellant filed the instant direct appeal wherein he raises sixteen issues for this Court's review, which we shall address following our mandatory review of the sufficiency of the evidence for the first-degree murder convictions.

## I. Sufficiency of the Evidence

In all death penalty direct appeals, whether or not the appellant specifically raises the issue, this Court reviews the evidence to ensure that it is sufficient to support the conviction or convictions of first-degree murder. *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 651 n. 3 (2008).

> Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. In the case of first-degree murder, a person is guilty when the Commonwealth

ments of law was substantially impaired;" "(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person;" and "(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(1), (2), (3), (5), and (8).

16

proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. An intentional killing is a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body.

*Id.* at 651–52 (citations and quotation marks omitted).

▄▄▄ Further, in reviewing whether the evidence was sufficient to support the first-degree murder conviction or convictions, the entire trial record should be evaluated and all evidence received considered. *Commonwealth v. Cousar,* 593 Pa. 204, 928 A.2d 1025, 1032–33 (2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 2429, 171 L.Ed.2d 235 (2008). In addition, we note that "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." *Id.* at 1033.

▄▄▄ Here, Appellant has not raised an issue regarding the sufficiency of the evidence; however, our independent review compels the conclusion that the evidence adduced at trial overwhelmingly supports Appellant's convictions for first-degree murder. The evidence established that at approximately 1:40 p.m. on April 28, 2000, Mt. Lebanon firefighters responded to an activated fire alarm set off at the Gordon residence at 788 Elm Spring Road, Mt. Lebanon. The responding firefighters, and police officers who later arrived at the scene, discovered at this residence the body of Anita Gordon, an Orthodox Jew, who had been shot multiple times in the chest, abdomen, and both hands, and who exhibited no signs of life. An incendiary device known as a Molotov cocktail was also discovered as having been thrown and ignited in a first-floor bedroom of the Gordon residence. During the discovery of the violence perpetrated at the Gordon residence, police began to receive reports regarding other nearby acts of violence,

specifically, shootings occurring at the Beth El Synagogue, 1.3 miles from the Gordon residence, and at the Scott Towne Center, a strip mall less than one mile from the synagogue. These reports identified the shooter as a white male driving a black Jeep.

While these reports were coming in, Officer Mary Susan Joyce was interviewing neighbors of Anita Gordon. Officer Joyce was questioning Inese Baumhammers, Appellant's mother, when Officer Joyce received a radio dispatch that the vehicle used in the reported shootings was a black Jeep registered to an individual named Baumhammers. Officer Joyce asked Ms. Baumhammers if she owned a black Jeep. Ms. Baumhammers replied that she did and that her son, Appellant herein, was then using the vehicle.

With respect to the first of two synagogue incidents, Susan Finder, a worshipper at Beth El Synagogue, testified that sometime after 1:20 p.m. on April 28, 2000, she was leaving the parking lot of the synagogue when she observed a black Jeep pull into the lot. Finder was able to identify Appellant as the driver of the Jeep. Dennis Wisniewski testified that on the day of the incident he was stopped at a red light three car lengths from the synagogue when he heard a bang and turned to see a man matching Appellant's description discharging five or six pistol rounds into the synagogue. Wisniewski testified that he then observed the shooter walk casually back to a black Jeep Cherokee. Philip Balk, a member of the synagogue, testified that at approximately 2:00 p.m., he arrived at the scene to observe that windows had been broken out and that a swastika and the word "Jew" had been spray-painted in red paint on the building. Detective Edward Adams of the Allegheny County Police testified that when he arrived at the synagogue at approximately 2:50 p.m., he observed the broken glass and the desecration with the red spray paint. He also observed two bullet holes in some of the glass and bullet fragments in the synagogue's vestibule.

Regarding the shooting at the Scott Towne Center, Joseph Lanuka testified that at approximately 1:30 p.m. on April 28, 2000, he dropped off Anil Thakur at the India Grocery, an

establishment in the shopping mall. Lanuka told Thakur that he would be back in fifteen minutes to pick him up. When Lanuka returned, he saw police entering the grocery store and Thakur's grocery bag lying on the ground. Lanuka went into the store and saw Thakur lying on the ground with three or four bullet holes in his chest. He also saw a man lying behind the counter, who was identified at trial as Sandip Patel. Thakur died from his wounds and Patel was paralyzed from his neck down as a result of the gunshots he had received. Also regarding this incident, John McClusky testified that at approximately 1:45 p.m., he heard a noise, which he ascertained were gunshots, and observed Appellant pointing a gun at an individual who ran past Appellant into the grocery store. Appellant turned and followed the man into the store; McClusky then heard three more gunshots. Appellant left the establishment, made eye contact with McClusky, and then walked slowly, calmly, and collectedly toward a lower area of the mall parking lot. McClusky then observed Appellant drive away in a normal fashion in a black Jeep Cherokee. Jennifer Lynn Fowler also testified that she witnessed the events described by McClusky.

A second synagogue incident occurred that afternoon at the Ahavath Achim Synagogue in Carnegie, approximately 2.1 miles from the Scott Towne Center. Carole Swed testified that at approximately 2:00 p.m. she was stopped at a traffic light across the street from the synagogue. Swed heard two loud pops and turned to observe Appellant, with a calm demeanor, standing outside of the synagogue. She observed him fire several shots into the synagogue, then get into a black Jeep and drive away. Swed was able to record the license plate number of the Jeep, and she promptly provided this information to the police, whom she immediately called. Detective Edward Fisher of the Allegheny County Police testified that when he arrived at the synagogue, he observed five bullet holes in the structure, including one in a flyer advertising a meeting of Holocaust survivors that was scheduled at the synagogue.

David Tucker testified that between 2:15 and 2:30 p.m. on April 28, 2000, he was the lone diner at the Ya–Fei Chinese Restaurant in the Robinson Towne Center, a strip mall located approximately ten minutes away by car from the Ahavath Achim Synagogue. In the restaurant at the time was Ji–Ye Sun, the restaurant manager, and Thao Pak Pham, a delivery person. During this period, Appellant walked into the restaurant carrying a briefcase. Appellant and Pham had a verbal exchange, and then Tucker saw Pham begin to run. Tucker testified that Appellant pulled a pistol from his case and shot Pham in the back as he was running past Tucker. Sun was shot in the chest. Although paramedics arrived quickly at the establishment, both Pham and Sun died from their gunshot wounds.

George Lester Thomas II testified that at approximately 2:40 p.m., he met his best friend, Garry Lee, at the C.S. Kim Karate Studio, located in the Center Stage Shopping Center, which was not a far distance from the Robinson Towne Center. Both men were warming up in the studio when Appellant entered and pointed a handgun at Thomas. Appellant did not shoot but turned the gun in the direction of Lee, who was standing next to Thomas. Appellant shot Lee twice in the chest and then calmly walked away as Thomas ran to the back of the studio in an effort to summon help. However, Lee died from his gunshot wounds. Thomas is white; Lee was black.

Diane Wenzig, the owner of a pizza shop two doors away from the karate studio, testified that she observed Appellant walk into the karate studio with a gun in one hand and a briefcase in the other. After hearing the gunshots, Wenzig instructed her son to call 911. Wenzig observed Appellant get into a black Jeep Cherokee, whose license plate number she recorded and provided to the police.

Following the report of this incident, Officer John Fratangeli of the City of Aliquippa Police Department was instructed to station himself on the Aliquippa–Ambridge Bridge along

20

Route 51 so that he could intercept Appellant.[3] Officer Fratangeli testified that at approximately 3:10 p.m., he observed Appellant's black Jeep Cherokee turn onto the bridge. Appellant was not driving erratically; in fact, he was driving within the speed limit and using proper turn signals. Officer Fratangeli followed Appellant's vehicle, and when assisting units arrived, he initiated a traffic stop, two blocks from another synagogue. Appellant was arrested and his .357 caliber pistol was found in a soft-sided briefcase in the Jeep. A criminologist with the Allegheny County Coroner's Office testified that forensic tests confirmed that the bullets recovered from the bodies of Anita Gordon, Anil Thakur, Ji–Ye Sun, Thao Pak Pam, and Garry Lee had all been discharged from Appellant's weapon.

At trial, the Commonwealth also introduced the testimony of Appellant's cellmates at different correctional facilities. Bobby Jo Eckles testified that Appellant told him that he had "shot a nigger" and that Appellant made other derogatory comments regarding blacks and Jews. David Brazell testified that Appellant told him that he had killed Anita Gordon "to make a statement" and that he had desecrated the Beth El Synagogue because that was where Mrs. Gordon had worshipped. Other fellow inmates testified that Appellant spoke of his anti-immigration and pro-segregation views, his desire to start a white supremacist party, and his hatred for all "ethnic" people.

The foregoing evidence was amply sufficient to permit the jury to conclude, beyond a reasonable doubt, that Appellant intentionally, deliberately, and with premeditation killed Anita Gordon, Anil Thakur, Ji–Ye Sun, Thao Pak Pam, and Garry Lee. Each of these victims was unlawfully killed; Appellant committed the killings; and the mere fact that Appellant shot four of the victims in the chest, sometimes several times, was sufficient to permit the jury to find a specific intent to kill. Additional evidence of Appellant's specific intent to kill included (1) the statements he later made

3. Aliquippa neighbors Center Township, where the karate studio is located.

indicating his desire to "make a statement" by his shooting of Mrs. Gordon; (2) his disparagement of the ethnicities of the victims; and (3) his violent desecration of synagogues.

Having determined that the evidence overwhelmingly supports his first-degree murder convictions, we now turn to Appellant's claims.

## II. Relaxed Waiver Rule

Although Appellant does not concede that any issue in this appeal was not timely raised and preserved below, he has anticipated, correctly, that the Commonwealth argues that many of his issues were not preserved and are thus waived. In anticipation of the Commonwealth's argument that certain of his issues are waived, Appellant contends that we should address the merits of such issues under the "relaxed waiver rule." Appellant acknowledges that we abrogated the relaxed waiver rule in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), well prior to his 2006 appeal. However, because his case was tried before *Freeman's* effective date, Appellant contends that it "makes sense" that he should reap the advantages of the rule because his trial counsel **might** have anticipated its application on appeal. Appellant's Brief at 20. Further, Appellant contends that all of his issues, save one, were "raised below" in his post-sentence motions, even if not during trial or on pre-trial motions.[4] Finally, Appellant asks that we invoke our discretion to review waived claims and, in particular, consider that his claims rise to the level of "primary constitutional magnitude." *Id.* at 21.

Prior to *Freeman*, this Court would address, **in its discretion,** issues in capital appeals not preserved below pursuant to a practice we referred to as the relaxed waiver rule. *See, e.g., Freeman, supra* at 400 (citing to several capital cases where we reviewed otherwise waived issues under the relaxed waiver rule). However, in *Freeman*, we abolished this rule, holding that, as a general rule on capital direct appeals, claims that were not properly raised and preserved in the trial court are waived and unreviewable. Such claims may be pursued

---

4. Counsel on post-sentence motions was different from trial counsel.

under the [Post Conviction Relief Act (PCRA)], as claims sounding in trial counsel's ineffectiveness or, if applicable, a statutory exception to the PCRA's waiver provision. This general rule ... reaffirms this Court's general approach to the requirements of issue preservation....[A]n assumption has arisen that all waived claims are available for review in the first instance on direct appeal. The general rule shall now be that they are not. In adopting the new rule, we do not foreclose the possibility that a capital appellant may be able to describe why a particular waived claim is of such primary constitutional magnitude that it should be reached on appeal. Indeed, nothing ... shall ... call[ ] into question the bedrock principles ... concerning the necessity of reaching fundamental and plainly meritorious constitutional issues irrespective, even, of the litigation preferences of the parties. Consistently with our [practice], however, we leave the specific articulation of any future exception to the actual case or controversy in which that "rare" claim arises.

*Id.* at 402.

Further, we made our new "rule" prospective, holding that the relaxed waiver rule would continue to apply only to those capital cases then briefed or in the process of being briefed. *Id.* at 403. Because we held that our **new** rule would apply to those cases in which the appellant's brief had not yet been filed in this Court and was not due for thirty days or more after the May 30, 2003 filing date of *Freeman*, all cases where the appellant's brief was due to be filed after June 28, 2003, or had not been filed by that date, were subject to our **new** rule. *Id.; see also Cousar, supra* at 1043.

In the instant case, Appellant was tried for capital murder prior to the effective date of the new rule set forth in *Freeman*. However, Appellant filed his notice of appeal on February 28, 2006, well after the effective date of the new rule established in *Freeman*. Therefore, the relaxed waiver rule clearly does not apply to Appellant's issues, even though Appellant's trial occurred prior to the effective date of the new rule. *See Commonwealth v. Moore*, 594 Pa. 619, 937 A.2d 1062, 1066 (2007) (holding that *Freeman* barred application of

the relaxed waiver rule where the appellant was convicted in 1999, prior to *Freeman*, but the appeal was filed after the effective date of the new rule set forth in *Freeman* ); and *Cousar, supra* at 1043 (holding that *Freeman* barred application of the relaxed waiver rule where the appellant was convicted in 2001, prior to *Freeman*, but the appeal was filed after the effective date of the new rule set forth in *Freeman* ). Therefore, Appellant's "waived claims may be considered, if at all, only as components of a challenge to trial counsel's stewardship." *Moore, supra* at 1066.

Moreover, the specific reasons asserted by Appellant for applying the relaxed waiver rule here are easily rejected. Appellant first argues that the relaxed waiver rule should be applied because trial counsel would have anticipated its application on appeal. However, "this Court has long emphasized that the relaxed waiver rule did not exist to permit capital defendants and their counsel to deliberately avoid raising contemporaneous objections." *Freeman, supra* at 403.

 Appellant next argues that those objections not contemporaneously raised below were nevertheless "raised in the lower court" by virtue of having been set forth in post-sentence motions. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Appellant has failed to show that Rule 302(a) has ever been interpreted as meaning that issues may be raised **at any time** during the lower court proceedings in order to preserve them. Rather, it is axiomatic that issues are preserved when objections are made timely to the error or offense. *See Commonwealth v. May,* 584 Pa. 640, 887 A.2d 750, 761 (2005) (holding that an "absence of contemporaneous objections renders" an appellant's claims waived); and *Commonwealth v. Bruce,* 207 Pa.Super. 4, 916 A.2d 657, 671 (2007), *appeal denied,* 593 Pa. 754, 932 A.2d 74 (2007) (holding that a "failure to offer a timely and specific objection results in waiver of" the claim). Therefore, we shall consider any issue waived where Appellant failed to assert a timely objection.

Finally, Appellant argues that we should review even waived claims if they rise to the level of "primary constitutional magnitude." Indeed, in *Freeman*, we specifically reserved the practice of "reaching fundamental and plainly meritorious constitutional issues irrespective, even, of the litigation preferences of the parties." *Freeman, supra* at 402. However, with respect to what are his "fundamental and plainly meritorious constitutional issues," Appellant references only his arguments concerning whether sentencing a mentally ill person to death and whether lethal injection constitutes cruel and unusual punishment. Appellant's Brief at 21–22; *see* discussion *infra* with respect to these issues. As shall be discussed *infra*, we do not agree that Appellant has raised any "fundamental and plainly meritorious constitutional issues." We therefore proceed to address Appellant's properly preserved substantive issues from both the guilt phase and sentencing phase of trial.

### III. Change of Venue or Venire

 Appellant argues that the trial court erred by not *sua sponte* ordering either a change of venue or an out-of-county venire panel despite the fact that trial counsel **specifically opposed** a change of venue or a change of the venire panel to persons outside of the county. Moreover, Appellant makes this argument despite the additional fact that the trial court, after conducting an evidentiary hearing on the issue of pre-trial publicity that included testimony given by an investigator hired by the court, granted Appellant's **specific request** to have the matter tried within Allegheny County with an Allegheny County jury.

As the facts make plain, this case was one of the most notorious in the history of Allegheny County, and was extensively covered by the media.[5] Not only was there significant pre-trial local news coverage of the events of April 28, 2000,

---

5. The trial court found that between April 28, 2000, and March 3 or 4, 2001, 535 local newspaper accounts concerning the killings and related subjects appeared. Further, the court also found that during this same period, 584 accounts concerning the event were aired on four local television stations. Many of these accounts "contained prejudicial and highly inflammatory information about [Appellant] and his alleged crimes." Trial Court Opinion, dated March 26, 2001, at 5–6.

but there was also coverage concerning the impact the crimes had on Sandip Patel, who was paralyzed, and on the survivors of those who had been killed. Many news stories also concerned the state of Appellant's mental health.

Anticipating that there could be difficulties in selecting an impartial jury in such an atmosphere, the trial court conducted a "testing of the venire" hearing on February 21, 2001. That hearing established that 102 of 107 potential jurors responded that they had read about, heard and seen on TV, or otherwise had personal knowledge of the events of April 28, 2000. Seventy-five of the 102 knowledgeable potential jurors indicated that they could not be fair and impartial if selected to serve on Appellant's jury. On March 15, 2001, the court conducted a second testing of the venire hearing at which a private investigator, hired by the court to examine local news coverage of the case, testified in detail as to the extent of local news coverage of the case. This second potential jury pool reflected knowledge and attitudes similar in proportion to that of the potential jury pool of the first hearing.

The evidence set forth at the hearings gave the trial court misgivings about selecting a jury panel from Allegheny County. Trial Court Opinion, dated March 26, 2001, at 21. However, at the March 15, 2001 hearing, Appellant specifically objected to a change in venire and specifically requested that the jury be selected from the citizens of Allegheny County, explaining that his trial strategy would be best served by having a local jury. Despite its concerns, the trial court acceded to Appellant's request, noting that not to do so would simply provide Appellant with an appeal issue for which a new trial would be requested. *Id.* Nevertheless, the trial court held another pre-trial hearing on April 11, 2001, at which the trial judge conducted a colloquy with Appellant, who unequivocally stated to the court that he understood the ramifications of selecting a jury from Allegheny County, but supported his counsel's decision to oppose a change of venire. It should be noted that Appellant is a former, non-practicing attorney.

Appellant now argues, as he did in post-trial motions, that the trial court erred by (1) failing to *sua sponte* deny Appel-

lant's objection to a change in venire; and (2) denying Appellant's **post-trial** request to hold an evidentiary hearing to consider the fairness of the trial as viewed through the testimony of Appellant's proffered expert witness. Dr. Edward Bronstein, a professor of political science, would have purportedly testified on behalf of Appellant that it was the professor's "strong opinion that the media coverage of the case raised the most serious concerns about the fair trial rights of [Appellant]." Appellant's Brief at 26.

However, Appellant is now arguing that the trial court **erred by granting** Appellant's direct objection to any change in venue or the venire panel, an objection lodged in pursuit of a particular trial strategy devised by Appellant. At the very least, Appellant must be considered to have waived his argument, as he clearly did not raise a timely objection to the trial court's refusal to order a change in venire. Thus, despite Appellant's argument that the trial court should have *sua sponte* ordered a change in venire, Appellant is essentially arguing that the court erred by sustaining Appellant's own objection. Thus, his argument must be deemed waived. Because Appellant's primary argument is waived, his subsidiary argument that the trial court erred by refusing to conduct a post-sentence motion to take testimony from Dr. Bronstein is without merit.[6]

We note further that in rejecting Appellant's post-sentence argument on this issue, the trial court specifically determined "that the record of the jury selection process established that it was possible to select a jury untainted by prejudicial pre-trial publicity. Such a jury was, in fact, selected in this matter." Trial Court Opinion, dated December 29, 2005, at 5. Here, Appellant utterly fails to dispute this determination by identifying any evidence in the record establishing or indicating that the jury **actually selected in this case** was biased or tainted by pre-trial publicity. Therefore, even if

6. Moreover, Appellant fails to explain how Dr. Bronstein's evidence would have been substantially different from that adduced by the trial court during its pre-trial change of venire hearings.

Appellant had not waived his argument, we would find no basis for relief.

In a similar vein, it is significant to note, as our now-Chief Justice has observed, that "[t]he trial judge is not an advocate, but a neutral arbiter interposed between the parties and their advocates.... With certain rare exceptions ... the trial judge is not duty-bound to raise additional arguments on behalf of one party or another such that, if and when the judge fails to do so, he has 'erred.'" *Commonwealth v. Overby*, 570 Pa. 328, 809 A.2d 295, 316 (2002) (Castille, J., dissenting); *see also Commonwealth v. Pachipko*, 450 Pa.Super. 677, 677 A.2d 1247, 1249 (1996) (noting that it is "clearly inappropriate" for a trial judge to raise an issue on behalf of a party and act as an advocate for that party). This observation simply mirrors that made by the United States Supreme Court, which determined:

> In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate.

*Dennis v. United States*, 384 U.S. 855, 875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (quoted with approval in *Commonwealth v. Edwards*, 535 Pa. 575, 637 A.2d 259, 261 (1993)). Indeed, in *Edwards*, we announced that it would be in the future **per se reversible error** if a judge instructs the jury concerning a defendant's right not to testify when the defendant has requested that no such instruction be given. *Edwards, supra* at 261. Similarly, it was not the place of the trial judge here to direct Appellant to pursue a different trial strategy when Appellant's chosen trial strategy was not violative of the law or our rules of procedure. In light of the above, we cannot determine that the trial court erred by sustaining Appellant's objection to a change in venue or venire.

## IV. Striking of Three Jurors from the Venire Panel

Appellant argues that he is entitled to a new capital sentencing hearing because the Commonwealth's pre-trial striking from the jury panel of three "otherwise qualified jurors," who had expressed their opposition to the death

penalty, allegedly resulted in the empanelling of a jury partial to the Commonwealth's request for the death sentence. Appellant's Brief at 28. Appellant notes that the United States Supreme Court has held that "a challenge for cause cannot be sustained based merely upon a venire person's voicing of general objections to the death penalty or expression of conscientious or religious scruples against its imposition." *Witherspoon v. Illinois,* 391 U.S. 510, 521–22, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *see also Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 81 (2004) (quoting *Witherspoon* ).

However, the record plainly shows that Appellant failed to timely object to the Commonwealth's challenges for cause to the three prospective jurors identified by Appellant as "otherwise qualified." [7] An appellant waives any issue concerning the striking of a venire person when he or she fails to object to a challenge for cause, even when the issue is "of constitutional dimension." *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373, 378 (1986); *see also Commonwealth v. Lewis,* 523 Pa. 466, 567 A.2d 1376, 1381 (1989) (holding that a failure to preserve an objection to the exclusion of a potential juror for cause results in waiver of the issue, even under the relaxed waiver rule); *Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365, 1379–80 (1984) (holding that even when prospective jurors are excluded for simply voicing a general opposition to or discomfort with the death penalty, defense counsel's failure to object to the striking for cause of such prospective jurors results in waiver of the issue). Accordingly, we conclude that this issue is waived.

## V. Search of Appellant's House and Seizure of his Personal Items

Appellant contends that the police violated his rights under the Fourth Amendment of the United States Constitution and

7. With respect to one potential juror, Edward Startari, Appellant's counsel did question the Commonwealth's challenge to this potential juror by stating, "This is cause?" The court responded to this question by stating, "Yes. No question about it." Notes of Testimony Jury Selection, 4/21/01, at 689. However, Appellant did not place an objection on the record to the Commonwealth's challenge to Startari. *See id.*

Article I, § 8 of the Pennsylvania Constitution by conducting a search of his house and effecting a seizure of personal items. Although the search was made pursuant to a search warrant as well as with the consent of Appellant's parents, Appellant argues that (1) the warrant allowing for a broad search for material was overbroad and not based on probable cause that such material was contraband or evidence of a crime; and (2) the consent for the search was invalid. Among the items seized from Appellant's house was his desktop computer. Pursuant to a subsequently issued warrant, the police examined the file contents of the computer, which revealed evidence of Appellant's racist and anti-immigrant philosophies. That evidence was later used by the Commonwealth at trial.

However, Appellant never filed a motion to suppress the evidence he now claims was impermissibly seized by the police. Pennsylvania Rule of Criminal Procedure 581 addresses the right of a criminal defendant to move to suppress evidence alleged to have been obtained in violation of his or her rights, and sets forth the procedure attendant to the disposition of a suppression motion. Rule 581(D) requires that a suppression motion state with specificity and particularity the evidence sought to be suppressed. Rule 581(B) provides: "If timely motion [for suppression of evidence] is not made hereunder, the issue of suppression of such evidence shall be deemed to be waived."

This Court has consistently affirmed the principle that a defendant waives the ground of suppressibility as a basis for opposition to the Commonwealth's introduction of evidence when he or she fails to file a suppression motion pursuant to our rules of criminal procedure. *See, e.g., Commonwealth v. Simmons,* 482 Pa. 496, 394 A.2d 431, 435 (1978) (holding that the specificity requirement of the suppression rule is mandatory, and therefore the failure to object to specific evidence in a suppression motion results in waiver of any argument that such evidence should have been suppressed); *Commonwealth v. Williams,* 454 Pa. 261, 311 A.2d 920, 921 (1973) (holding that any objection to the introduction of evidence on constitutional grounds is waived in the absence of the filing of a suppression

motion pursuant to the applicable rule of criminal procedure). Accordingly, we determine that Appellant has also waived his claim that the evidence seized from his house should have been suppressed.

## VI. Recording of Telephone Conversation

At trial, the Commonwealth introduced into evidence a recording of a telephone conversation made March 2, 2001, at the Allegheny County Jail between Appellant, then an inmate of the jail, and his parents, during which the parents appeared to accuse Appellant of being a racist. The Commonwealth's psychiatric expert in some part relied upon this recording in forming his opinion that Appellant had acted from racist motives rather than from a mental illness. Appellant had moved to suppress the evidence of the telephone conversation pre-trial, arguing that it. violated Section 5704(14) of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (Wiretap Act), 18 Pa.C.S. § 5704(14), because there had purportedly been no written notification that the conversation would be recorded.[8] Appellant also argued that Section 5704(14) of the Wiretap Act was violated a second time when the contents of the recorded conversation were divulged to a detective and the Commonwealth's psychiatric expert.

In denying the suppression motion, the court found that the evidence established that inmates generally receive notice in two ways that their outgoing telephone conversations are

---

8. Section 5704(14)(i)(A) provides:
 It shall not be unlawful and no prior court approval shall be required under this chapter for:
 (14) An investigative officer, a law enforcement officer or employees of a county correctional facility to intercept, record, monitor or divulge any telephone calls from or to an inmate in a facility under the following conditions:
 (i) The county correctional facility shall adhere to the following procedures and restrictions when intercepting, recording, monitoring or divulging any telephone calls from or to an inmate in a county correctional facility as provided for by this paragraph:
 (A) Before the implementation of this paragraph, all inmates of the facility **shall be notified in writing** that, as of the effective date of this paragraph, their telephone conversations may be intercepted, recorded, monitored or divulged.
 18 Pa.C.S. § 5704(14)(i)(A) (emphasis added).

recorded: (1) through written notice in the prison handbook; and (2) through a computer-generated message on the telephone itself that is audible to both the inmate and the party on the other end of the conversation. Further, the court found that evidence adduced at the hearing established that Appellant and his parents were **actually aware** that their telephone conversations were being recorded. Indeed, during the March 2, 2001 conversation, Appellant's father warned Appellant that the conversation was being recorded by prison authorities. Finally, the court determined that the contents of the conversation were properly divulged pursuant to the Wiretap Act's directive that contents of recorded conversations may be divulged in connection with "the prosecution or investigation of any crime." 18 Pa.C.S. § 5704(14)(i)(C).[9] Accordingly, the court determined that the Wiretap Act had not been violated because Appellant had received prior written and aural notice—and had actual notice as well—that his telephone conversations were being recorded by prison personnel, and because the contents of the conversation were divulged in conformance with the statute.

Post-trial, Appellant's new counsel, after reviewing a copy of the prison handbook, determined that the handbook did not actually contain written notice that prison telephone conversations are recorded, as had been found factually by the suppression court. Appellant's new counsel also obtained an affidavit from the head of operations at the jail when Appellant was incarcerated there, who confirmed that the prison handbook did not contain written notice to inmates regarding the interception and recording of their telephone conversations. Based on this information, Appellant argued in post-trial motions, as he is arguing now before us, that the telephone conversation at issue was made in violation of Section 5704(14)(i)(A) of the Wiretap Act, as that section requires

**9.** Section 5704(14)(i)(C) of the Wiretap Act provides:

(C) The contents of an intercepted and recorded telephone conversation shall be divulged only as is necessary to safeguard the orderly operation of the facility, in response to a court order or in the prosecution or investigation of any crime.

18 Pa.C.S. § 5704(14)(i)(C).

**written,** not other, notice. The trial court rejected this argument, noting that the fact that Appellant **actually knew** that his conversation was being recorded controlled the disposition of the issue. Further, the court determined that Section 5704(14)(i)(A) of the Wiretap Act did not require written notice to every inmate individually, but only prior written notice to the existing inmates before a correctional facility could implement a program of intercepting and recording inmate telephone conversations. This determination was based on the court's reading of the subparagraph relied on by Appellant for his argument, to wit, "**Before the implementation of this paragraph,** all inmates of the facility shall be notified in writing that, **as of the effective date of this paragraph,** their telephone conversations may be intercepted, recorded, monitored or divulged." 18 Pa.C.S. § 5704(14)(i)(A) (emphasis added).[10]

■ Appellant now renews his arguments to this Court, contending that it was irrelevant that he was under actual notice that his telephone conversation was being intercepted and recorded, when the statute required that he receive prior written notice.[11] In making this argument, Appellant relies upon our case law holding that the requirements of the Wiretap Act must be strictly adhered to and that a defendant

10. The trial court further determined that the record showed that all participants in the telephone conversation at issue, *i.e.,* Appellant, his mother, and his father, by their knowledge that their conversation was being recorded, **consented** to the interception and recording of the conversation. Section 5704(4) of the Wiretap Act provides that it shall not be unlawful for a person to intercept a communication "where all parties to the communication have given prior consent to such interception." 18 Pa.C.S. § 5704(4). However, federal case law has held, under the Federal Wiretap Act, that inmate knowledge that telephone conversations may be intercepted and recorded **and consent** to such action are not equivalent. *See, e.g., United States v. Daniels,* 902 F.2d 1238, 1244–45 (7th Cir.1990). Because of our disposition of this issue, we need not determine whether the trial court's alternative grounds for denying Appellant relief has merit.

11. Appellant does not cite to any evidence that the Commonwealth **by purposeful design** misrepresented to the suppression court that which appears not to be true, to wit, that the prison handbook contains written notification that inmate telephone conversations could be intercepted and recorded.

need not establish prejudice prior to obtaining relief. *See, e.g., Commonwealth v. Hashem,* 526 Pa. 199, 584 A.2d 1378, 1381–82 (1991) (applying a completely different section of the Wiretap Act, namely Section 5718, pertaining to disclosure to the defendant of court-authorized intercepts). We cannot agree with the conclusions Appellant reaches.

■ Appellant is certainly correct that because the Wiretap Act infringes upon the constitutional right to privacy, its provisions are strictly construed. *See Kopko v. Miller,* 586 Pa. 170, 892 A.2d 766, 772 (2006). However, this principle does not compel a reviewing court to abandon all recognition of the facts before it or to ignore the principle that statutes are not to be construed in a manner that would yield an absurd result. *See* 1 Pa.C.S. § 1922(1) (providing that in ascertaining the intent of the General Assembly in the enactment of a statute, it is presumed that the General Assembly did not intend a result that is absurd or unreasonable). Simply stated, there is no basis to conclude that the privacy rights of Appellant or his parents were infringed when their March 2, 2001 telephone conversation was recorded. These individuals were actually aware that their telephone conversation was being or could be intercepted and recorded by prison authorities. Written notice to Appellant, assuming he never received any, would not have afforded him any greater protection of his right to privacy or that of his parents than the actual notice they possessed at the time of the conversation. Therefore, on this basis alone, Appellant's argument is wholly without merit.

■ Finally, there is no basis for Appellant's supplemental argument that Section 5704(14)(i)(C) of the Wiretap Act was violated when the contents of the telephone conversation at issue were divulged to an investigating detective and to the Commonwealth's psychiatric expert. Section 5704(14)(i)(C) provides:

(C) The contents of an intercepted and recorded telephone conversation shall be divulged only as is necessary to safeguard the orderly operation of the facility, in response to a

court order or in the prosecution or investigation of any crime.

18 Pa.C.S. § 5704(14)(i)(C).

Appellant avers that Section 5704(14)(i)(C) is ambiguously written and should be interpreted in a manner that permits disclosure only "to safeguard the orderly operation of the facility." However, a plain reading of this section refutes this contention. This section provides that a recording of a telephone conversation involving an inmate may be divulged under **any** of three instances: (1) only as is necessary to safeguard the orderly operation of the facility; (2) pursuant to a court order; or (3) in the prosecution or investigation of any crime. The March 2, 2001 conversation was divulged pursuant to the third circumstance. Appellant has failed to cite to any authority that would compel a result where a properly intercepted and recorded conversation is prohibited from being used in the prosecution or investigation of any crime. Therefore, we conclude that the trial court correctly determined that no violation of Section 5704(14)(i)(C) occurred.

## VII. Cross–Examination of Dr. Merikangas

Prior to trial, Appellant's counsel consulted with forensic psychiatrist, Robert Wettstein, M.D., who on several occasions had interviewed Appellant after his crime spree. Appellant ultimately decided not to call Dr. Wettstein to testify, but instead relied principally upon the expert testimony of another psychiatric expert, James R. Merikangas, M.D., in support of his insanity defense. Dr. Merikangas had **not** consulted with Dr. Wettstein in arriving at his conclusions. At a pre-trial hearing, the trial court ruled that Dr. Wettstein's notes could not be examined or used by the Commonwealth because they consisted of attorney-client and attorney work-product protected documents. Indeed, it appears that the Commonwealth never obtained Dr. Wettstein's notes, records, or report. However, at trial and over Appellant's objection, the trial court permitted the Commonwealth to cross-examine Dr. Merikangas concerning his failure to consult with Dr. Wettstein.

Appellant specifically identifies the following testimony as prejudicial:

Q. [Commonwealth]: He [Dr. Wettstein] interviewed [Appellant], didn't he?

A. [Dr. Merikangas]: If you say so.

Q. Well, what if [Appellant] on that date would have said that he wasn't hearing voices, I just hate blacks, wouldn't that be important for you to know?

A. If that were the case. I don't know what happened.

Q. Well, that's right, you don't know because you didn't talk to Wettstein, isn't that right?

Notes of Testimony ("N.T.") Trial, 5/4/01, at 1500. It is important to note that Appellant does not argue that by this questioning, the Commonwealth divulged the contents of Dr. Wettstein's report or notes. Rather, Appellant argues that the Commonwealth's questions "suggested that, like the prosecution's expert, Dr. Welner, Dr. Wettstein believed that [Appellant] was a malingerer and a racist." Appellant's Brief at 48.

In overruling Appellant's objection to the Commonwealth's questions pertaining to Dr. Wettstein, the trial court determined that such questioning did not violate the court's pretrial ruling prohibiting the Commonwealth's acquisition and use of Dr. Wettstein's report or invade the area of confidential exchanges between Appellant and Dr. Wettstein. Rather, the court determined that the questioning was relevant both to the issue of Dr. Merikangas's possible bias and the foundation for his opinion. The issue of potential bias related to previously disclosed evidence that Appellant had stated to a cellmate that he had two psychiatric experts, and that he had chosen the one that was more favorable to his case while rejecting the other. The issue of the foundation for Dr. Merikangas's opinions pertained to the degree to which this witness had explored records and psychiatric evaluations of other psychiatric professionals in order to obtain a more complete picture of Appellant's mental state. The court determined that the Commonwealth could explore these issues without delving into

the substance of Dr. Wettstein's reports and records. N.T. Trial, 5/4/01, at 1496.

Appellant now argues that the information the Commonwealth was attempting to elicit from Dr. Merikangas concerned confidential communications that took place between Appellant and Dr. Wettstein, and for this reason is protected by (1) work-product and (2) attorney-client privileges, and (3) the Sixth Amendment right to effective assistance of counsel. We shall examine Appellant's theories and apply them to the facts *seriatim.*

(1) The work-product doctrine was adopted by this Court and placed into practical effect in Pa.R.Crim.P. 573(G), which reads as follows:

[Pre-trial d]isclosure shall not be required of legal research or of records, correspondence, reports, or memoranda to the extent that they contain the opinions, theories, or conclusions of the attorney for the Commonwealth or the attorney for the defense, or members of their legal staffs.

*See Commonwealth v. Kennedy,* 583 Pa. 208, 876 A.2d 939, 946 (2005) (explaining that the general work-product doctrine as recognized by United States Supreme Court case law was adopted by this Court in the context of pre-trial discovery in criminal matters and delineated in Pa.R.Crim.P. 573(G)).

Further, the rules of criminal procedure pertaining to pre-trial discovery generally protect the work-product of agents hired by defense attorneys. *Id.* at 946–47. *See* Pa.R.Crim.P. 573(C)(1)(a) (providing that upon the Commonwealth's filing of a motion for pre-trial discovery, the trial court may order the defendant, subject to his or her right to be free from compulsory self-incrimination, to divulge reports or test results that the defendant intends to introduce into evidence or which were prepared by a witness whom the defendant intends to call to testify at trial).[12] Pa.R.Crim.P. 573(C) does not require the defendant to disclose reports prepared by a witness whom he or she does not intend to produce at trial.

12. At the time of Appellant's 2001 trial, these provisions were found at Pa.R.Crim.P. 573(C)(2)(a)(i).

In *Kennedy, supra,* we extended the principles of the work-product doctrine from the realm of pre-trial discovery to the course of the trial itself, specifically holding

that a practical application of the work-product doctrine to trial in criminal proceedings prevents the Commonwealth from calling as a witness an agent who[m] the defense hired in preparation for trial but decided not to call as a witness at trial[,] or to use the materials prepared by the agent as evidence at trial, unless the Commonwealth can show a substantial need for such testimony and an inability to obtain the substantial equivalent of such testimony without undue hardship. Consequently, absent these showings, a trial court may not compel such testimony.

*Id.* at 948–49 (footnote omitted).

In the case *sub judice,* the Commonwealth never obtained any reports or notes of Dr. Wettstein, nor did the Commonwealth call Dr. Wettstein to testify. Therefore, the work-product protections that this Court has extended to defendants by rule of criminal procedure or case law were not violated. The mere questioning of one expert witness as to whether his failure to consult with another witness who was not called afforded a full view upon which to base an expert opinion does not implicate the work-product doctrine as defined and applied by this Court.

(2) Appellant's arguments concerning alleged violations of attorney-client privileges and his right to effective assistance of counsel appear to be two sides of the same coin. A criminal defendant is protected by the benefits of an attorney-client privilege; also, he or she is constitutionally entitled to effective assistance of counsel. *Commonwealth v. Chmiel,* 558 Pa. 478, 738 A.2d 406, 422–23 (1999). Our Superior Court, based on federal case law, has determined that the attorney-client privilege in criminal matters extends to communications made between the defendant and an agent hired by the defendant's attorney to provide legal assistance. *Commonwealth v. Noll,* 443 Pa.Super. 602, 662 A.2d 1123, 1126 (1995). The court stated, "This privilege protects those disclosures

that are necessary to obtain informed legal advice which might not have been made absent the privilege. This privilege *only* applies where the [defendant's] ultimate goal is legal advice." *Id.* (citing *In re Grand Jury Matter*, 147 F.R.D. 82, 84 (E.D.Pa.1992); emphasis in original).

Notably, Appellant does not suggest or argue how the Commonwealth obtained and then divulged to the jury any legal advice given by Dr. Wettstein as an agent for Appellant's attorney. Again, the Commonwealth never obtained any reports or notes of Dr. Wettstein, nor did the Commonwealth call Dr. Wettstein to testify, nor did the Commonwealth introduce evidence of Dr. Wettstein's advice to Appellant, if he gave any, through any other witness. There is no basis for the claim that Appellant's attorney-client protections were violated by the Commonwealth's cross-examination of Dr. Merikangas.

(3) With regard to a criminal defendant's right to effective assistance of counsel within the context of the issue Appellant raises herein, the Third Circuit Court of Appeals has stated:

The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of necessity make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness.

*United States v. Alvarez*, 519 F.2d 1036, 1046–47 (3d Cir.1975).

The *Alvarez* court also couched its concern over such disclosures in terms that related to violation of the attorney-client

privilege. Indeed, *Alvarez* has been interpreted as reading a broad attorney-client privilege into the Sixth Amendment requirement of effective counsel. *See Noggle v. Marshall,* 706 F.2d 1408, 1413 (6th Cir.1983); *see also State v. Mingo,* 77 N.J. 576, 587, 392 A.2d 590, 595–96 (1978) (finding a similarity between the attorney-client privilege and the Sixth Amendment right to effective assistance of counsel, and holding that reliance upon the confidentiality of an expert's advice is a critical aspect of a defense attorney's ability to consult with and advise his or her client).[13] Hence, Appellant's arguments concerning alleged violations of attorney-client privileges and his constitutional right to effective assistance of counsel are essentially the same.

██ As with our determination that the Commonwealth's cross-examination of Dr. Merikangas did not offend Appellant's right to attorney-client privileges, for the same reasons, Appellant's argument invoking the Sixth Amendment right to effective counsel would not have any merit even if we were to decide the question of when such right is implicated, which we decline to do at this time. The record is clear that the Commonwealth did not have access to Dr. Wettstein's notes or reports, did not introduce them into evidence, and did not call Dr. Wettstein to testify. Thus, nothing of record indicates any interference with Appellant's counsel's right or ability to rely upon the confidential communications of an expert retained but not called to testify. Accordingly, Appellant's Sixth Amendment argument lacks the factual predicate the case law he cites in support of his argument would require for establishing relief. Therefore, we determine that none of the theories Appellant has advanced in support of this issue has merit.

13. However, other courts have disputed that there is a constitutional implication when the prosecution calls as a witness a psychiatric expert consulted by the defendant, and have further refused to recognize a link between the attorney-client privilege and the Sixth Amendment right to effective assistance of counsel. *See, e.g., Noggle, supra* at 1413–15 (and cases cited therein); and *People v. Spiezer,* 316 Ill.App.3d 75, 87–88, 249 Ill.Dec. 192, 735 N.E.2d 1017, 1025–26 (2000) (and cases cited therein, rejecting the *Alvarez* Sixth Amendment analysis).

## VIII. Cross–Examination of Dr. Merikangas as Due Process Violation

Appellant next argues that the Commonwealth violated Appellant's due process rights when the Commonwealth posed the following question to Dr. Merikangas on cross-examination: "Well, what if [Appellant] on that date would have said that he wasn't hearing voices, I just hate blacks, wouldn't that be important for you to know?" N.T. Trial, 5/4/01, at 1500. Appellant contends that this question violates his due process rights because the question lacked a good faith basis in the evidence, citing *Commonwealth v. Smith*, 580 Pa. 392, 861 A.2d 892, 896 (2004). In *Smith*, we reversed a death sentence and remanded for a new penalty hearing because the prosecutor, during the penalty phase of trial, referenced the fact that the appellant had been convicted of assaulting a fellow prisoner with a weapon in order to establish that the appellant posed a danger to the prison population. However, no competent evidence had been introduced at trial establishing the fact of this conviction. We determined that an examination of the record revealed that the error was not harmless.[14] Here, Appellant argues that he is entitled to a new trial on guilt because the prosecutor's question assumed a fact not in evidence, to wit, that Appellant had told Dr. Wettstein that he did not have hallucinations but merely hated blacks.

At the very most, the Commonwealth's cross-examination of Dr. Merikangas may have suggested, by this one question, that Dr. Wettstein, like Dr. Welner, had determined that Appellant had killed the victims because of his racist views rather than while suffering from a mental disease sufficient to rise to the level of insanity. Thus, the Commonwealth's question arguably assumed a fact not in evidence. However, Appellant never objected to the question, except to the extent that he had previously objected to the Commonwealth's general line of questioning that referenced Dr. Wettstein, which

14. We observe that although the appellant in *Smith* did not object to the prosecutor's remark, we determined that the issue could be reviewed under the relaxed waiver doctrine as the case preceded the effective date of the *Freeman* abolition of that doctrine. *Smith, supra* at 896 n. 2.

objection was based on the trial court's pre-trial ruling that the Commonwealth could not have access to Dr. Wettstein's report or records. Appellant never lodged an objection specifically to the question at issue, nor did he lodge one on the grounds that the Commonwealth's questions assumed a fact not in evidence or were violative of Appellant's due process rights. Accordingly, we determine that this issue is waived. *See May, supra* at 761 (holding that the absence of a specific contemporaneous objection renders the appellant's claim waived).

### IX. Denial of Right to Present Mitigating Evidence

▉ Appellant next argues that his right to present mitigating evidence was improperly curtailed by the trial court. At a penalty hearing, a capital defendant may present relevant evidence in mitigation. 42 Pa.C.S. § 9711(a)(2); *May, supra* at 765. Evidence is relevant to mitigation if it is probative of any of the enumerated mitigating circumstances set forth at 42 Pa.C.S. § 9711(e). Although Appellant presented evidence to the jury regarding five mitigating circumstances, his present argument concerns only the mitigating circumstances described at 42 Pa.C.S. § 9711(e)(2), concerning whether the defendant was under the influence of extreme mental or emotional disturbance, and (e)(3), concerning whether the defendant had a substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. With respect to the argument Appellant now raises, we note that "[t]he admissibility of evidence, including evidence proffered at the penalty phase of a capital trial, is within the discretion of the trial court, and such rulings will form no basis for appellate relief absent an abuse of discretion." *Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 459 (2006).

Appellant's argument has two components. In the first, Appellant contends that the trial court abused its discretion by refusing to allow sentencing phase testimony by Christine Martone, M.D., the chief psychiatrist at the Allegheny County Behavior Clinic, an arm of the Allegheny County Court of

Common Pleas. In the second, Appellant contends that the court abused its discretion by precluding the publication to the jury of mitigating evidence in the form of a redacted portion of the March 2, 2001 recorded telephone conversation between Appellant and his parents, during which the parents expressed their opinion that Appellant's criminal actions stemmed from his mental illness.

### (A) Dr. Martone

Dr. Martone's responsibilities to the court of common pleas require that she evaluate defendants for competency and for dispositional recommendations after a finding of guilt. In her official capacity, Dr. Martone examined Appellant five times after the shootings, the first time being on May 2, 2000, only four days after the shootings occurred. It was Dr. Martone who initially determined that Appellant was not competent to stand trial.

During the guilt phase of trial, the trial court denied, on conflict of interest grounds, Appellant's request that Dr. Martone testify regarding Appellant's alleged insanity.[15] However, the court did allow Appellant to question Dr. Martone concerning her psychiatric examination and findings. Appellant's questions to Dr. Martone concerned her examination of Appellant on two occasions in May 2000. Dr. Martone testified that, based on those examinations, she had diagnosed Appellant with schizophrenia of the paranoid type and had determined that he suffered from auditory hallucinations.

At the penalty phase of trial, Appellant sought to present similar and/or additional testimony from Dr. Martone[16] to address the mitigating factors described at 42 Pa.C.S. § 9711(e)(2), concerning whether the defendant was under the

15. We note that at a sidebar conference, Dr. Martone represented to the court that she never examined Appellant for insanity, but only for competence to stand trial. N.T. Trial, 5/5/01, at 1760.

16. Appellant's argument fails to set forth the substance of the testimony he had hoped to elicit from Dr. Martone or how such testimony would have been different from that given by Dr. Martone during the guilt phase of trial. As shall be discussed later in the text, this is a significant omission.

influence of extreme mental or emotional disturbance, and 42 Pa.C.S. § 9711(e)(3), concerning whether the defendant had a substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. However, the court refused Appellant's request because it determined that allowing Dr. Martone, a court employee, to testify for either Appellant or the Commonwealth at this point of the trial would represent a conflict of interest between the court's neutrality and the interests of the litigants. Additionally, the court was further concerned that if other inmates became aware that Dr. Martone could be called to testify, they would be reluctant to speak openly to her. The court also noted that Dr. Martone had not examined Appellant for sanity, but rather only for competence to stand trial, and that Appellant had at his disposal several psychiatric expert witnesses who had testified for Appellant during the guilt phase of trial and who would be available to testify during the penalty phase of trial. Moreover, the court ruled that Appellant **could** read Dr. Martone's guilt-phase testimony to the jury during the penalty phase and could present argument based on that testimony. N.T. Trial, 5/9/01, at 2748-51.[17]

Appellant now argues that the court abused its discretion by refusing to permit Dr. Martone to testify at the penalty phase of trial. First, Appellant contends that the ruling violated a local rule of criminal procedure, All.C.R.Crim.P. 300.31, which provided: [18]

> In the trial of any homicide case, after a verdict of Murder of the First Degree is recorded and the court proceeds to the determination of whether a sentence of life imprisonment or the death penalty should be duly imposed, as required by 42 Pa.C.S. § 9711, the court may, upon application of the defense, permit the calling of Behavior Clinic representatives in mitigation.

17. The court also opined on the record that it believed that it had initially erred by allowing Dr. Martone to testify during the guilt phase of trial and was "not going to repeat [this] error." N.T. Trial, 5/9/01, at 2752.

18. On July 27, 2007, All.C.R.Crim.P. 300.31 was rescinded.

Second, Appellant refutes the reasoning that Dr. Martone's testimony would have represented a conflict of interest because Dr. Martone had already testified during the guilt phase of Appellant's trial. Additionally, Appellant contends that the court's fear that defendants would be less likely to speak with Behavior Clinic psychiatrists if they knew that these individuals might later testify, is unfounded if such testimony would be beneficial to the defendants, as purportedly Dr. Martone's testimony would have been for Appellant. Appellant also notes that Dr. Martone had testified in 1995 at the penalty phase of one other capital defendant tried in the Allegheny County Court of Common Pleas, as evidenced by our discussion in *Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 72–74 (2003).[19]

Third, although Appellant acknowledges that during the penalty phase of his trial he presented the testimony of two other psychiatric experts for support of the mitigating factors about which he wanted Dr. Martone to testify, he contends that Dr. Martone's testimony would not have been cumulative of this testimony. Appellant contends that Dr. Martone's testimony would have carried greater credibility with the jury than Appellant's hired witnesses because she would have been purportedly viewed by the jury as a "neutral" witness. Moreover, unlike Appellant's other experts, Dr. Martone examined Appellant near-immediately after the shootings. Additionally, Appellant alleges that his testifying experts were not familiar with the "standards" of the mitigating factors set forth at 42 Pa.C.S. § 9711(e)(2) and (3), even though they testified that in their professional opinions, Appellant met those standards. *See* Appellant's Brief at 59. We shall address these three arguments *seriatim.*

■ First, as is plain from its words, now-repealed Allegheny County Criminal Rule 300.31 placed the determination as to whether a Behavior Clinic representative would testify

19. However, it is not clear from *Fears* what the circumstances were surrounding Dr. Martone's testimony during that proceeding, *i.e.,* whether the defendant had no other witness to testify regarding all of the matters about which Dr. Martone testified in that case.

upon a defense application within the sound discretion of the trial court; the rule did not mandate that the court grant all requests made under the rule. Therefore, there is no violation of the rule absent a showing of an abuse of discretion. Moreover, Appellant never cited this rule to the court as a basis for his argument that Dr. Martone should testify; Appellant is raising this theory for the first time on appeal. *See* N.T. Trial, 5/9/01, at 2746–52.

Second, Appellant's argument concerning the trial court's stated reasoning for not allowing Dr. Martone to testify does not compel the conclusion that the trial court abused its discretion; in fact, it compels the opposite conclusion. In *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745 (2000), we reiterated the well-known definition of "abuse of discretion" as follows:

The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Id.* at 753.

Here, Appellant does not establish that the court's reasoning was based on prejudice, personal motivations, or capricious or arbitrary actions; rather, Appellant simply disagrees with the court's reasoning. The record plainly shows that the court had serious and reasonable concerns with allowing any litigant to call Dr. Martone to testify, given her position with the court and her ongoing, critical duties, which could be jeopardized should she be subject to being called as a witness without sufficient cause. Further, the record shows that the court took into consideration the fact that Appellant had at least

three other witnesses qualified to testify as to the same mitigating circumstances for which Appellant wished to call Dr. Martone. Finally, the court observed that the jury already had the benefit of Dr. Martone's testimony, and that Appellant would be free to publish to the jury, during the penalty phase, the substance of that testimony. Thus, there is no basis in the record to conclude that the court's determination that Dr. Martone should not testify in the penalty phase, based on a potential conflict of interest, was based on partiality, prejudice, bias, or ill will.[20]

Finally, Appellant's argument that Dr. Martone's testimony would not have been cumulative of that of his two psychiatric experts who testified during the penalty phase of trial is not persuasive. Notably, Appellant does not indicate how Dr. Martone's testimony would have differed significantly from that of his other witnesses, or indeed from that testimony Dr. Martone had already given the jury during the trial phase and which was available for re-publishing to the jury during the penalty phase. Rather, the differences Appellant cites to involve two other aspects: (1) the fact that Dr. Martone had actually examined Appellant near-immediately after the crimes in May 2000, unlike his other two witnesses; and (2) Dr. Martone would have been considered by the jury as a "neutral" witness instead of one biased because of being hired by the defense or, in the case of Matcheri S. Keshavan, M.D., by being Appellant's regular treating psychiatrist.

With respect to the fact that Dr. Martone had examined Appellant in May 2000, we note that the testimony Dr. Martone had already given to the jury involved precisely her examination of Appellant in May 2000, and her findings from those examinations. Appellant does not explain how Dr. Martone would have presented anything new had she been allowed to testify during the penalty phase. Indeed, the record establishes that during the penalty phase, Appellant

20. We also note that Appellant did not address the Commonwealth's argument that it would be fundamentally unreasonable to accept Appellant's position that Dr. Martone should be available to testify **only** when her testimony is beneficial to a defendant.

presented only truncated versions of the testimony of his expert psychiatric witnesses, Drs. Keshevan and Merikangas, because their guilt-phase testimony was incorporated by reference at the penalty phase. *See* N.T. Trial, 5/10/01, at 2924–25 and 2944. Moreover, Appellant had the opportunity to call to testify, but chose not to do so, Laszlo Petras, M.D., a hospital staff and Beaver County Jail psychiatrist, who had actually evaluated Appellant **on the day of the murders,** and who had testified for Appellant during the guilt phase of trial.

With respect to Dr. Martone's neutrality, it is only speculative that the jury might have considered her a more persuasive witness, particularly as her examination of Appellant was limited to no more than five encounters and was expressly confined to the question of whether Appellant was competent to stand trial. By contrast, Dr. Keshavan had treated Appellant for mental illness for seven years prior to the shootings. Both Dr. Keshavan and Dr. Merikangas described the severity of Appellant's mental illness and the potentially exacerbating effect on his mental illness of Appellant's not taking his medications, which Appellant posited, with some evidence, was the case at the time of the crime spree.

Further, with the witnesses he presented at the penalty phase, Appellant **carried** his burden of proving to the jury the mitigating circumstance described at 42 Pa.C.S. § 9711(e)(2), concerning whether the defendant was under the influence of extreme mental or emotional disturbance. Thus, the absence of Dr. Martone's testimony regarding this mitigating factor did not result in prejudice to Appellant. In addition, the alleged "bias" of Drs. Keshavan and Merikangas and the fact that they did not examine Appellant close to the time of the crimes proved no impediment to Appellant in proving this mitigating circumstance.

Appellant did not prove the mitigating circumstance described at 42 Pa.C.S. § 9711(e)(3), concerning whether the defendant had a substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Appellant contends that Dr. Martone's testimony "would have helped establish this" mitigating factor.

Appellant's Brief at 59. However, Appellant sets forth absolutely no basis for this conclusion. Again, Appellant does not indicate what testimony Dr. Martone would have provided to help establish the subsection (e)(3) mitigating factor. Further, Appellant does not indicate how Dr. Martone would have helped achieve Appellant's goal of establishing this mitigating factor when she had examined Appellant only to determine competency to stand trial, not for a general assessment of sanity.

There is no questioning the importance of a capital defendant's right to present mitigating evidence at the penalty phase of trial. However, in light of the above discussion, we must conclude that the trial court did not abuse its discretion by denying Appellant's request to present the testimony of Dr. Martone.

### (B) March 2, 2001 Telephone Conversation

Appellant argues that the court abused its discretion by precluding the publication to the penalty-phase jury of the portion of the March 2, 2001 recorded telephone conversation between Appellant and his parents where the parents apparently expressed their opinion that Appellant's acts had been caused by mental illness (for convenience, this portion of the telephone conversation shall hereafter be referred to as "the mental illness discussion"). The genesis of this argument lies in the trial court's allowing the prosecution, during the rebuttal portion of the guilt phase of trial, to publish to the jury a redacted portion of the March 2, 2001 recorded telephone conversation that contained the accusation by Appellant's parents that Appellant was a racist. The parents' accusation was based on Commonwealth evidence, by this point shared with the defense, that while in prison, Appellant had autographed for another inmate newspaper or magazine articles on controversial racial issues and had made racist remarks in conversation with this inmate. The Commonwealth sought publication of the redacted portion of the March 2, 2001 telephone conversation to corroborate the truth of the inmate's testimony regarding these events based on Appellant's admission on the

tape that he had engaged in this conduct. Additionally, the Commonwealth sought to bolster its case that Appellant had committed the crimes because of his racism and not because of insanity, based on Appellant's failure to deny his parents' charge that he was a racist. The trial court redacted the telephone conversation to conform, at least in substantial part, with Appellant's specific objections to publishing other portions of the conversation to the jury.[21] N.T. Trial, 5/8/01, at 2455, 2460, 2500.

During the penalty phase, the trial court denied Appellant's request to publish to the jury the mental illness discussion, which had not been previously disclosed to the jury. The basis for the trial court's ruling was that the mental illness discussion constituted inadmissible hearsay, as Appellant was attempting to use this evidence, constituting prior **consistent** statements, to prove the truth of the matter asserted.[22] (Appellant's parents testified during the penalty phase, and expressed their opinion that their son was mentally ill and had acted under the influence of this illness.) However, the court did permit Appellant to use the transcript of the mental illness discussion to refresh the recollection of Appellant's father, during the father's penalty-phase testimony.

In arguing that the court abused its discretion by its ruling, Appellant fails to address the basis for the court's determination. Rather, Appellant contends that the mental illness discussion should have been entered into evidence pursuant to Pa.R.E. 106. Rule 106 provides:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction **at that time** of any other part or any other

21. These unpublished portions of the conversation involved discussion of the death penalty and Appellant's legal counsel. N.T. Trial, 5/8/01, at 2455, 2460.

22. By contrast, the trial court permitted the redacted portion of the telephone conversation during the guilt phase of trial pursuant to Pa.R.E. 803(25), as admissions by a party opponent, a hearsay exception. N.T. Trial, 5/8/01, at 2466, 2479–80.

writing or recorded statement which ought in fairness to be considered **contemporaneously** with it.

Pa.R.E. 106 (emphasis added).

As can be seen from a plain reading of Rule 106, Appellant's argument has no merit. Appellant is not arguing that the court abused its discretion by failing to allow the mental illness discussion to be read to the jury **at the time** the Commonwealth published to the jury the redacted portion of the March 2, 2001 telephone conversation **during the guilt phase of trial.** Rather, Appellant is arguing that the trial court abused its discretion by refusing to allow the publication of the mental illness discussion at the penalty phase of trial, a point in time well removed from the time of the publication of the material that Appellant now argues requires consideration. Accordingly, Rule 106 is not implicated at all. In addition, Appellant makes no argument as to how the mental illness discussion would have helped him establish the mitigating factor described at 42 Pa.C.S. § 9711(e)(3).

Finally, we note that the trial court's ruling was correct. In general, prior consistent statements, as they constitute hearsay, are admissible under only very limited circumstances. Pennsylvania Rule of Evidence 613(c) provides:

(c) **Evidence of prior consistent statement of witness.** Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the witness about the statement, and the statement is offered to rebut an express or implied charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

(2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation.

Pa.R.E. 613(c).

The comment to this rule relevantly provides that "under Pa.R.E. 613(c), a prior consistent statement is always received

for rehabilitation purposes only and not as substantive evidence." *See Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284, 301 (1998) (stating: "As a general rule, a prior consistent statement is hearsay, and its admissibility is dependent upon an allegation of corrupt motive or recent fabrication. Additionally, such statements have been admitted in response to an allegation of faulty memory.") (citations omitted). Here, Appellant does not argue that the mental illness discussion should have been published to the jury to rehabilitate the same testimony given by Appellant's parents during the penalty phase of trial.

For all of the above reasons, Appellant's argument regarding the mental illness discussion is wholly without merit.

## X. Evidence of Parole Ineligibility (*Simmons* Charge)

In his next argument, Appellant contends that "[s]ince the evidence raised an inference of [Appellant's] future dangerousness, the [trial] court's failure to permit the defense to introduce evidence of [Appellant's] parole ineligibility, and the likelihood of commutation and to instruct the jury that Pennsylvania law does not permit a defendant convicted of first-degree murder to be released on parole violated [Appellant's (1)] due process and [ (2)] Eighth Amendment rights." Appellant's Brief at 64; emphasis added.

Appellant first contends that the trial court erred by failing to give the jury what is referred to as a *Simmons* instruction, *i.e.*, that a life sentence means life imprisonment without the possibility of parole. We have described the *Simmons* instruction, and our law regarding when a criminal defendant is eligible for relief with respect to same, as follows:

In *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality), a plurality of the United States Supreme Court would have held that, if a prosecutor argues a capital defendant's future dangerousness at a sentencing trial, the defendant may request and should be granted a jury instruction that a penalty of life in prison will render the defendant ineligible for parole. *Id.* at 170, 114 S.Ct. at 2197. This Court has held that a *Simmons*

instruction is mandated only if two events occur: (1) the prosecutor must place the defendant's future dangerousness in issue; and (2) the defendant must have requested that the trial court issue the instruction. *Commonwealth v. Dougherty,* 580 Pa. 183, 860 A.2d 31, 37 (2004), *cert. denied,* 546 U.S. 835, 126 S.Ct. 63, 163 L.Ed.2d 89 (2005); *Commonwealth v. Jones,* 571 Pa. 112, 811 A.2d 994, 1004 (2002) (citing *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1291 (2000), *cert. denied,* 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002)). The failure to issue a *Simmons* charge is no basis for relief where *these* circumstances are not met. *Jones,* 811 A.2d at 1004.

*Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 273 (2006), *cert. denied,* —— U.S. ——, 128 S.Ct. 384, 169 L.Ed.2d 270 (2007) (emphasis added).

▓▓▓ As can be gleaned from the manner in which Appellant raises his argument, he does not allege that **the prosecution** had raised the issue of future dangerousness to the jury. Rather, he argues that the issue was brought forth to the jury by the nature of **the** general **evidence itself.** Specifically, he contends that the extensive evidence concerning his mental illness given by eight mental health experts (seven of whom had testified on behalf of Appellant) had established the issue of future dangerousness in the minds of the jury. With respect to the evidence given by the Commonwealth's mental health witness, Dr. Welner, Appellant notes that this witness opined that Appellant suffers from a personality disorder shared with perhaps 70% of the criminal population that is characterized by "a pattern of rule breaking and lying," and that Appellant in particular has demonstrated a "lifetime pattern of irresponsibility." *See* Appellant's Brief at 70. Appellant also notes the extensive evidence introduced at trial that highlighted his racist views.

However, the evidence Appellant cites does not specifically indicate "a tendency to **prove dangerousness in the future."** *Kelly v. South Carolina,* 534 U.S. 246, 254, 122 S.Ct. 726, 151

L.Ed.2d 670 (2002) (emphasis added).[23] For example, in *Kelly*, a case decided after Appellant's trial, the United States Supreme Court determined that a *Simmons* instruction was required where the prosecutor (1) adduced testimony that the defendant, following his arrest, created a shank while in prison and had made an escape attempt that included a plan to lure a female guard into his cell to be used as a hostage; (2) adduced testimony from a psychologist that the defendant was a sadist as a child and had developed an inclination to kill anyone "who rubbed him the wrong way;" (3) argued to the jury that the defendant was dangerous and unpredictable while referring to him as "the butcher of Batesburg," "Bloody Billy," and "Billy the Kid;" and (4) opined to the jury that "murderers will be murderers[, and the defendant] is the cold-blooded one right over there." *Id.* at 248–50, 122 S.Ct. 726. By contrast, in the case *sub judice*, the Commonwealth did not present evidence establishing Appellant's future dangerous propensities. The evidence Appellant cites is not even remotely similar in character to the evidence in *Kelly*. Essentially, the evidence Appellant cites indicates only that he will continue to suffer from his mental disorders, making him, according to Dr. Welner, a liar, a rule-breaker, and irresponsible. This is not evidence of future dangerousness, or evidence of a "demonstrated propensity for violence," triggering the need for a *Simmons* instruction. *See Kelly, supra* at 253, 122 S.Ct. 726.

23. *Kelly* affirmed and further clarified the United States Supreme Court's holding in *Simmons*. The Court held that a *Simmons* instruction, when requested by the defense, is required by due process when the jury hears evidence of a defendant's propensity for violence such that it would reasonably "conclude that [the defendant] presents a risks of violent behavior whether locked up or free, and whether free as a fugitive or a parolee." *Kelly, supra* at 253–54, 122 S.Ct. 726. Thus, while *Simmons* determined that due process concerns are implicated when the prosecutor argues future dangerousness, *Kelly* appears to hold that relevant due process concerns may be triggered when the **evidence** establishes future dangerousness. *See Kelly, supra* at 260, 122 S.Ct. 726 (Rehnquist, C.J., dissenting). However, the majority opinion in *Kelly* was based on the prosecutor's evidence **and** argument. *See Kelly, supra* at 253, 122 S.Ct. 726 ("the evidence and argument ... [show] that future dangerousness was ... an issue in this case") (citation and quotation marks omitted). Thus, by its evidence and argument, the prosecution in *Kelly* placed the issue of future dangerousness before the jury.

Additionally, the Commonwealth did not raise the issue of future dangerousness by its argument to the jury, nor does Appellant contend that it did.[24]

More importantly, Appellant never specifically requested a *Simmons* instruction. Rather, he asked the trial court to allow him to publish to the jury an affidavit by Nelson R. Zullinger, Secretary of the Board of Pardons, which purportedly averred that since September 13, 1978, only one person sentenced to life imprisonment in the Commonwealth has ever had a sentence commuted or been granted clemency or a pardon. Appellant's Brief at 67. The trial court denied Appellant's request, holding that such evidence should not come in unless the Commonwealth raised the issue of future dangerousness. However, a request to introduce such evidence is not the equivalent of asking the court to provide a specific instruction to the jury pursuant to *Simmons*.

Accordingly, Appellant has failed to meet either of the two requirements for obtaining relief on the issue of whether a jury should be instructed as to parole ineligibility, set forth, *inter alia*, in *Carson, supra* at 273. That is, Appellant has failed to show that the Commonwealth had placed the issue of future dangerousness before the jury and that he had requested a *Simmons* charge. Therefore, Appellant is not entitled to any relief under his due process claim. *Carson, supra* at 273.

In the second prong of his argument, Appellant contends that he was entitled to introduce into evidence the affidavit of Mr. Zullinger pursuant to Appellant's rights under the Eighth Amendment to the United States Constitution. Appellant acknowledges that the United States Supreme Court has never ruled that the Eighth Amendment requires a parole ineligibility instruction and the admission of evidence regarding same at every capital sentencing in states prohibiting release on parole on a life sentence, nor has this Court ever made a parole ineligibility instruction mandatory in capital cases. Notwithstanding, Appellant contends that *Kelly, su-*

---

24. Our independent review of the Commonwealth's closing argument establishes that the Commonwealth did not raise the issue of future dangerousness. *See* N.T. Trial, 5/11/01, at 3079–88.

*pra,* which was decided after Appellant's trial and sentencing, affords him a basis for relief because that case purportedly "acknowledged that a capital defendant's future dangerousness always will be a foremost consideration for jurors." Appellant's Brief at 75.

However, in this case, Appellant has failed to point to any evidence that specifically indicates his future dangerousness, and, quite significantly, Appellant failed to request either a *Simmons* instruction or a jury instruction pursuant to the Eighth Amendment. Thus, no relief is due. *See Carson, supra* at 272–74 (rejecting the appellant's similar Eighth Amendment argument where the prosecution had not raised the issue of future dangerousness).

## XI. Victim Impact Evidence

Appellant argues that because the victim impact evidence presented at the penalty phase was "unduly prejudicial," his due process rights under the Fourteenth Amendment of the United States Constitution and Article I, § 9 of the Pennsylvania Constitution were violated. Appellant acknowledges that in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that victim impact evidence introduced in a capital sentencing hearing did not violate the Eighth Amendment of the United States Constitution. In fact, Appellant notes that *Payne* expressly recognized that evidence showing "a quick glimpse of the life [the defendant] chose to extinguish," was not a *per se* violation of the Eighth Amendment. *Payne, supra* at 825, 830, 111 S.Ct. 2597 (O'Connor, J., concurring, quoting *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)). However, Appellant notes that the separate opinions of the Justices in *Payne* recognized a limit on the use of victim impact evidence. Specifically, where victim impact evidence is unduly inflammatory, several Justices noted that inclusion of such evidence might entitle a defendant to relief under the Due Process Clause of the Fourteenth Amendment. *See id.* at 831, 111 S.Ct. 2597 (O'Connor, J., concurring).

Here, Appellant argues that the evidence adduced from fourteen victims of Appellant's crimes at the sentencing phase of trial crossed the threshold from being "a quick glimpse of the life [the defendant] chose to extinguish" to being unduly inflammatory and prejudicial. Appellant highlights the following evidence: (1) Bang Gho, Thao Pak Pham's wife, describing how their six-year-old son kept asking when his father would return home and how she and her son arrived at the crime scene before her husband's body had been removed; (2) two of Anita Gordon's daughters describing the devastating impact Mrs. Gordon's death had had on their father and grandmother, and how the latter had to be moved to a nursing home because Mrs. Gordon was no longer available to care for her; (3) a friend of the Gordons describing the intense pain the family suffered; (4) individuals familiar with Anil Thakur describing the financial effect that the victim's death had on his parents in India, who no longer receive the financial assistance the victim had provided; (5) Ji–Ye Sun's 70–year-old father describing how his wife had cried so much that she required surgery to save her sight, and his own feelings of having "lost everything;" and (6) Mr. Sun's wife, Jun Sun, describing how, after her husband's death, she was unable to eat, drink, or sleep but experienced pain and a sense that her "brain is empty." Appellant's Brief at 77–78. Appellant avers that the prejudicial impact of this evidence on the jury outweighed its probative value.

There are myriad problems with Appellant's argument. The first and most significant is that Appellant never made timely and specific objections to the evidence. Appellant had filed a pre-penalty phase motion *in limine* to exclude **all** victim impact evidence on the grounds that, because such evidence did not pertain to any statutory aggravating circumstance, the admission of the evidence was unconstitutional. The court denied the motion, noting that the United States Supreme Court had ruled that such evidence was permissible, citing *Payne*. However, the court indicated that Appellant could request from the Commonwealth an offer of proof as to each witness and could lodge an objection particular to that

witness if appropriate. Appellant never objected to any of the Commonwealth's fourteen victim impact witnesses.[25] Because Appellant failed to object to the evidence on the grounds that he now raises, his issue is waived. Pa.R.A.P. 302(a).

However, it must also be emphasized that "Pennsylvania jurisprudence favors the introduction of all relevant evidence during a capital sentencing proceeding," including victim impact evidence. *Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122, 1139 (2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 211, 169 L.Ed.2d 158 (2007). Indeed, victim impact evidence is statutorily admissible in the penalty phase of capital cases pursuant to Section 9711(a)(2) of the Sentencing Code, 42 Pa.C.S. § 9711(a)(2). "Victim impact testimony is permissible when the Commonwealth establishes that the victim's death had an impact on the victim's family as opposed to presenting mere generalizations of the effect of the death on the community at large. Once this threshold has been met, the trial court has discretion over the testimony admitted." *Eichinger, supra* at 1139–40; *see also Commonwealth v. Williams,* 578 Pa. 504, 854 A.2d 440, 446 (2004). Testimony that is "a personal account" describing the "devastating impact the murders had on" the surviving families is wholly appropriate and admissible at the sentencing phase of a capital case. *Eichinger, supra* at 1140.

Here, the specific evidence that Appellant challenges is in the same mold as that determined to be appropriate in *Eichinger* and *Williams.* The evidence challenged by Appellant consists of personal accounts describing the devastating impact the murders had on the surviving family members. Moreover, the number of witnesses called to testify was not disproportionate to the number of Appellant's victims. Thus, there is patently no basis for the conclusion that the trial court abused its discretion by admitting such evidence, even if Appellant had not waived the issue.

**25.** Notably, Appellant did object to the introduction of a photograph during the testimony of Jun Sun. The court sustained the objection.

## XII. Victim Impact Evidence as Causing the Death Sentence to be based on Caprice and Vague Factors

In this argument, Appellant concedes that the trial court **correctly** charged the jury in accordance with this Court's case law regarding victim impact evidence. However, Appellant "argues" that the admission and consideration of victim impact evidence interjects an unconstitutionally vague and capricious factor into a jury deliberation process that must determine whether statutory aggravating factors outweigh mitigating factors. Appellant concedes that there is no Pennsylvania authority supporting his argument;[26] however, he raises this claim for the purpose of "preserv[ing] it for federal review." Appellant's Brief at 80.

Appellant did not object to the jury charge relating to this issue. Accordingly, Appellant's issue is waived. Pa.R.A.P. 302(a). Moreover, Appellant does not even appear to be asking this Court for relief with respect to this issue. *See* Appellant's Brief at 79–81. Certainly, none is warranted.

## XIII. Dr. Welner's "Damning Hearsay"

Appellant argues that his rights under the Sixth Amendment Confrontation Clause were violated when the Commonwealth's psychiatric expert witness, Dr. Welner, testified regarding statements made to him by individuals who did not testify at trial. These individuals included a psychologist who had briefly treated Appellant in 1994; high school and law school classmates; Appellant's sister; Appellant's ex-girlfriend; and Appellant's accountant. *See* Appellant's Reply Brief at 15–17 (listing these individuals as those at issue). Dr. Welner purportedly used the information provided by these individuals in arriving at his conclusion that although Appellant suffered from several psychiatric disorders, Appellant's crimes were not caused by a psychotic illness.

In support of his argument, Appellant cites *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177

---

**26.** However, Appellant does cite to dissenting opinions in *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143 (2001).

(2004), which held that the Confrontation Clause of the Sixth Amendment prohibits the use of **testimonial** hearsay obtained by police officers against a criminal defendant, even if such hearsay is reliable, unless the defendant has the opportunity to cross-examine the out-of-court declarant. In so doing, the Court announced a new interpretation of the Confrontation Clause, overruling its earlier holding in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *Crawford, supra* at 54, 124 S.Ct. 1354 Appellant acknowledges that he had failed to object to Dr. Welner's use of information obtained from these individuals. However, he argues that because *Crawford* was decided after his trial and sentencing, which trial occurred when the relaxed waiver rule of *Freeman* was still in effect, he should not now be penalized for failing to anticipate *Crawford's* changing the law.

Appellant's contention that he should not be penalized for failing to have preserved his objections to the challenged evidence is baseless. "It is settled that, in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at all stages of adjudication up to and including the direct appeal." *Commonwealth v. Jones*, 571 Pa. 112, 811 A.2d 994, 1005 (2002) (quoting *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649, 652 (2001) (quotation marks omitted)).[27] Here, Appellant failed to timely object to the now-challenged evidence. Moreover, although *Crawford* signaled a change in the law, Appellant fails to indicate how this change was material to his failure to have preserved the issue for review. In *Crawford,* the Court overruled its previous position that testimonial hearsay did not violate the Confrontation Clause if such evidence bore an "adequate indicia of reliability" by either falling within a "firmly rooted hearsay exception" or having "particularized guarantees of trustworthiness." *Crawford, supra* at 40, 124 S.Ct. 1354 (quoting *Roberts, supra* at 66, 100 S.Ct. 2531).

27. Indeed, the Superior Court has applied this basic legal principle to specifically hold that in order for *Crawford* to be applied retroactively, the appellant would have had to preserve his or her objections to the challenged evidence. *Commonwealth v. Gray*, 867 A.2d 560, 574 (Pa.Super.2005).

*Crawford* holds that now testimonial hearsay obtained by police is inadmissible unless the defendant had the opportunity to cross-examine the out-of-court declarant. *Id.* at 51–53, 124 S.Ct. 1354.

■■ Here, Appellant did not challenge, as he could have, the purported hearsay statements made during Dr. Welner's testimony on the grounds that they did not bear adequate indicia of reliability by either falling within firmly rooted hearsay exceptions or having particularized guarantees of trustworthiness, or on any other grounds. If Appellant was troubled by the purported hearsay testimony given by Dr. Welner, he did not need support from the specific legal principles later announced in *Crawford* to pursue his objections. Thus, there is no question that Appellant has waived this issue.[28]

## XIV. Lethal Injection as Cruel and Unusual Punishment

■■ Appellant argues that the Eighth Amendment of the United States Constitution and Article I, § 13 of the Pennsylvania Constitution prohibit lethal injection because this penalty constitutes cruel and unusual punishment. Appellant contends that there is "mounting evidence" that prisoners experience "excruciating pain" during execution by lethal injection, particularly since it is believed that potassium chloride, one of the three drugs used, causes a burning sensation as it courses through the body. Appellant's Brief at 83. Appellant argues that until Pennsylvania investigates whether its three-drug execution protocol is humane, the procedure should be declared a cruel and unusual punishment under the Eighth Amendment of the United States Constitution and Article I, § 13 of the Pennsylvania Constitution.

However, the only issues before us are whether Appellant's conviction is valid and whether his death sentences were properly imposed. Our inquiry does not extend to the statuto-

28. We would also note that the purported hearsay of Dr. Welner's testimony is not "testimonial" hearsay as contemplated by the Court in *Crawford*. Thus, *Crawford* is inapplicable in any event.

ry manner by which the death sentence will be imposed, if it is imposed at all. Until a death warrant has been issued for Appellant, we need not determine the issue of whether the **then**-form of execution, whatever it might be, comports with the Eighth Amendment of the United States Constitution and Article I, § 13 of the Pennsylvania Constitution.

In *Commonwealth v. Terry*, 513 Pa. 381, 521 A.2d 398 (1987), this Court was confronted with a claim that the defendant's death sentence should be vacated because there was then no existing statutory authority for the death penalty. We dismissed the claim, holding: "Only the sentence of death is before us. Since no death warrant has been issued, the question of the method of execution is not properly before us. We will consider this issue if and when it is properly before us." *Id.* at 412. Similarly, because the issue of the means of execution is not properly before us, we will dismiss Appellant's argument without prejudice to his right to raise it at a more appropriate time.[29]

### XV. Imposition of the Death Penalty on a Mentally Ill Person

Appellant argues that the Eighth Amendment prohibits the imposition of the death penalty on a mentally ill person.[30] Appellant cites *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), for the proposition that the imposition of a death sentence on mentally retarded individuals violates evolving standards of decency embodied in the Eighth Amendment's Cruel and Unusual Punishment Clause. Appellant argues that *Atkins* should be extended to individu-

**29.** We note that the United States Supreme Court has recently ruled that Kentucky's three-drug protocol of lethal injection, one of the drugs being potassium chloride, is not cruel and unusual punishment under the Eighth Amendment. *Baze v. Rees*, —— U.S. ——, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).

**30.** Appellant's very brief argument does not specifically state whether he is arguing that a person who has committed first-degree murder while mentally ill should not be executed or whether a person who is mentally ill at the time of execution should not be executed. We infer from Appellant's discussion of relevant case law that he is arguing the former.

als such as himself, who had been described at trial by all psychiatric expert witnesses as suffering from mental illnesses.

However, as Appellant acknowledges, this Court has rejected a substantially similar argument in *Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28, 38 (1991). In *Faulkner*, we stated:

Appellant's last argument on this subject is that the death penalty statute violates the Eighth Amendment to the United States Constitution by permitting the jury to impose the death penalty when they have found, as a mitigating circumstance, that the defendant was mentally ill. Appellant argues that an automatic life sentence should be imposed and not the death penalty-when the jury finds mental illness as a mitigating circumstance. In *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689 (1986), this Court stated that a finding of substantial mental impairment under 42 Pa.C.S. § 9711(e)(3) does not bar a death penalty imposed by the jury:

Our legislature could have provided that a finding of substantial impairment precludes imposition of the death sentence[;] however, it did not do so. Instead, it determined that this factor was to be weighed by the jury along with all the other factors and that it is within the province of the jury to determine how much weight it should be accorded.

*Fahy*, 512 Pa. at 317, 516 A.2d at 698–99. We believe this rationale is equally applicable when the jury finds as a mitigating factor that a defendant suffered from "a degree of mental illness."

*Id.* at 38.

Appellant has failed to advance a compelling argument that would lead us to alter our holdings in *Faulkner* and *Fahy*. Appellant mentions that evolving standards of decency should prompt a reassessment of these decisions. However, Appellant does not engage in any analysis as to why this should be

the case. Accordingly, we conclude that Appellant's argument is without merit.

## XVI. Vienna Convention

 Appellant contends that his rights under the Vienna Convention on Consular Relations (the "Convention"), 21 U.S.T. 77, T.I.A.S. No. 6820, were violated. Appellant, an American citizen raised and educated in the United States, apparently holds dual citizenship with Latvia, a signatory, as is the United States, to the Convention. The preamble to the Convention provides that its purpose is to "contribute to the development of friendly relations among nations." 21 U.S.T. at 79; *see also Medellin v. Texas,* —— U.S. ——, ——, 128 S.Ct. 1346, 1353, 170 L.Ed.2d 190 (U.S.2008). In pursuit of that end, Article 36 of the Convention was drafted to "facilitat[e] the exercise of consular functions." Art. 36(1), 21 U.S.T. at 100. This article provides that if a person detained by a **foreign** country " 'so requests,** the competent authorities of the **receiving** State shall, without delay, inform the consular post of the **sending** State' of such detention, and 'inform the [detainee] of his righ[t]' **to request assistance from the consul of his own state."** *Medellin, supra* at 1353 (quoting Art. 36(1)(b)) (emphasis added). Appellant complains that he was not informed of his "rights" under Article 36(1)(b). Appellant's Brief at 86.

The absurdities of Appellant's argument are manifold. Appellant was not detained by a foreign country but by authorities in his own country and state. Appellant was not "sent" by Latvia to be "received" by the United States; he is not a foreign national. Not only is Appellant a United States citizen, he was also trained as a lawyer in the United States. He was represented by counsel at all stages who spoke the same language as Appellant, came from the same American culture as Appellant, and engaged in legal procedures undoubtedly familiar to Appellant from his legal training. Perhaps Appellant believes that he would have had a better trial result had he been represented at trial by a Latvian attorney or afforded advice by the Latvian Consulate. If so, he has not

indicated how his defense was prejudiced by this omission. Moreover, Appellant never requested that the Latvian Consulate be notified.[31]

Appellant argues that the decisions of the International Court of Justice ("ICJ") prohibit the execution of a **foreign national** where the provisions of the Convention have not been followed, specifically citing the *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States )*, 2004 I.C.J. 12 (March 31, 2004) (*"Avena "*). Aside from the fact that Appellant is not a foreign national, the United States Supreme Court recently ruled that ICJ judgments, and specifically *Avena*, are not binding on our domestic law because none of the relevant treaty sources establishes binding domestic law in the absence of implementing legislation, and no such legislation has been enacted. *Medellin, supra* at 1360–65. In other words, the Convention is not "self-executing." *See id.* at 1365–66.

In short, there is absolutely no merit to this argument.

## XVII. Ineffective Assistance of Counsel

 Appellant's last argument details alleged instances where he was given ineffective assistance of trial counsel.[32] "Claims of trial counsel ineffectiveness are generally deferred to post-conviction review so that they might be properly developed on a full and complete evidentiary record." *Cousar, supra* at 1043 (citing *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 736–37 (2002)). Appellant makes no legal argument as to why his ineffectiveness claims should not be deferred

31. It does not appear that Appellant is represented by Latvian counsel on appeal, and Appellant made no averment that he ever consulted with the Latvian consulate to better understand his post-trial rights, despite his knowledge of the Convention.

32. Specifically, Appellant alleges that trial counsel was ineffective for having failed to (1) request a change of venue or venire; (2) object to the removal of prospective jurors Mock and Hawthorne; (3) move to suppress the evidence obtained pursuant to the April 28, 2000 search of Appellant's house; and (4) object to and seek a hearing regarding his "forced drugging" and request a jury instruction regarding the reasons for his "apparent stupor" during trial. *See* Appellant's Brief at 86–92.

until post-conviction review.[33] Accordingly, we conclude that Appellant's ineffectiveness claims must be deferred to post-conviction proceedings, as contemplated by the rule set forth in *Grant,* if Appellant chooses to pursue them.

## XVIII. Statutory Review

Having concluded that Appellant's convictions were proper and that none of his claims of error entitles him to relief, we must affirm each death sentence unless we find that: (i) the sentence was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3); *Cousar, supra* at 1044. Upon careful review of the record, we are persuaded that Appellant's death sentences were not the product of passion, prejudice, or any other arbitrary factor, but rather resulted from properly introduced evidence that Appellant intentionally and deliberately shot to death Anita Gordon, Anil Thakur, Ji–Ye Sun, Thao Pak Pham, and Garry Lee. We also conclude that the evidence was sufficient to support the two aggravating factors found by the jury in relation to the killings. There is no doubt that "[i]n the commission of the offense [Appellant] knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa.C.S. § 9711(d)(7). When Appellant shot Ji–Ye Sun and Thao Pak Pham, he created a grave risk of death to David Tucker, who was present in the restaurant when Appellant opened fire multiple times on his victims. In fact, Pham was shot just two to three feet away from Tucker as he was running past Tucker, who was trying to "dodge" the danger that was unfolding before him. N.T. Trial, 4/30/01, at 433–35. When Appellant shot Garry Lee, he created a grave risk of death to George Lester Thomas II,

**33.** Indicating that a petition for post-conviction review will likely be filed, Appellant contends that we will have to review these ineffectiveness issues anyway, so we may as well review them now. Aside from our general disinclination to act based on prognostications of the future, we see no reason to circumvent the rule in *Grant,* as it was cogently based on the premise that a review of ineffectiveness claims is generally best made upon a full factual record developed by a post-conviction court.

who was present in the karate studio when Lee was shot quite near to him, and in fact, Appellant had first pointed his weapon at Thomas. Further, there is no doubt that "[t]he defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the same time of the offense at issue." 42 Pa.C.S. § 9711(d)(11). Here, Appellant was convicted of five murders, all of which were committed during the two-hour homicidal rampage that occurred on April 28, 2000.

For the foregoing reasons, we affirm the verdicts and sentences of death. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with Section 9711(i) of the Sentencing Code, 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE and MESSRS. Justice EAKIN and BAER join the Opinion.

Justice SAYLOR files a Concurring Opinion.

Justice TODD files a Concurring Opinion.

Justice SAYLOR, Concurring.

I join Parts I through V and XIII through XVIII of the majority opinion, concur in the result with regard to Parts VI through XII, and write to the following.

As to Issue VI, concerning the interception of Appellant's telephone conversations in the asserted absence of written notice, Appellant presents a plain-meaning interpretation of a statute which plainly requires written notice.[1] Further, Ap-

---

1. The trial court construed the statute to require one-time written notice to existing inmates only upon implementation of the overall practice of recording calls. *See Commonwealth v. Baumhammers*, Nos. 200014712 *et al., slip op.* at 14 (C.P. Allegheny Dec. 29, 2005) ("The Court does not read this paragraph as requiring that written notice be provided to every inmate upon their admission to the facility."). Neither the Commonwealth nor the majority, however, advocates such a construction. Furthermore, although the statute does appear to be ambiguous in the relevant regard, applying the Court's practice of strictly construing in favor of the privacy interests which are intended

pellant relies on decisions of this Court establishing that exceptions to the prohibition against wiretapping must be strictly construed, see *Boettger v. Miklich*, 534 Pa. 581, 585–86, 633 A.2d 1146, 1148 (1993), as well as this Court's admonition that: "No violations of *any* provisions of the Act will be countenanced[.]" *Commonwealth v. Hashem*, 526 Pa. 199, 206, 584 A.2d 1378, 1382 (1991) (emphasis in original). In light the clear terms of the statute, *Boettger*, and *Hashem*, I cannot support the majority's characterization of Appellant's argument as being wholly without merit, based on the mere assessment that provision of the written notice required by the Legislature would not have advanced the privacy interests involved. *See* Majority Opinion, at 33, 960 A.2d at 79. Rather, it seems to me that the majority's approach represents a departure from the requirement of strict construction and/or a form of prejudice assessment, as was previously prohibited. *See Hashem*, 526 Pa. at 205, 584 A.2d at 1381 ("We must likewise specifically reject the Superior Court's holding that before relief can be granted in this type of claim the Defendant must bear the burden of showing how the failure to comply with the Act prejudiced him.").[2]

Nevertheless, I believe the Commonwealth appropriately relies on the principles governing review of suppression-court

to be safeguarded, as referenced below, I agree with the conclusion that the relevant statutory notice is to be provided to each inmate.

**2.** While the majority correctly observes that the provision of the Act under review in *Hashem* appeared in a separate section of the statute, the *Hashem* Court repeatedly indicated that its approach applied more broadly to the Wiretap Act as a whole, and the majority does not explain how the application of a strict-enforcement approach to one portion of the statute is to be reconciled with its more pragmatic approach to another.

The Commonwealth predicates its argument that a plain-meaning application of the legislative mandate for written notice would be absurd upon an example involving the uselessness of providing written notice to blind or illiterate inmates. *See* Brief for Appellee at 42. This does not seem to me to furnish a reason for the judiciary to retool the statute, however, as such inmates may (and should) obtain assistance from prison officials or others in reading written materials made available to them. Moreover, it seems axiomatic that exceptional circumstances should not be taken to eviscerate clearly stated rules of general application in non-exceptional circumstances.

rulings, which center the appellate court review on the record of the suppression hearing. *See, e.g., Commonwealth v. Eichinger*, 591 Pa. 1, 22, 915 A.2d 1122, 1134 (2007). Here, even if inmates were not in fact informed via the institution handbook of the practice of recording calls, the evidence presented to the suppression court indicated otherwise. *See* N.T. at 571–573 (reflecting the testimony of a jail official to the effect that inmates were "[f]irst of all, and most foremost" notified through a posted inmate handbook of the practice of recording telephone calls). The two items of contrary evidence upon which Appellant now relies (the handbook itself and an affidavit of a jail employee) were not brought onto the record of the suppression hearing, but apparently were obtained by Appellant's counsel after sentencing. As the Commonwealth explains, however, such items are not appropriately considered in this Court's direct review of the suppression court's ruling, as they were not before the court at that time. Accordingly, although Appellant may have claims of deficient stewardship to assert during post-conviction proceedings, I do not believe that his argument in this direct appeal is cognizable on the terms on which it is presented.[3]

With regard to Issue VII, I agree with the majority that the contested testimony did not violate attorney-client or work-product privileges. *See* Majority Opinion, at 36–37, 960 A.2d at 81. Nevertheless, I also agree with Appellant that there was a significant possibility that the evidence of Dr. Merikangas' failure to consult with Dr. Wettstein could have had a prejudicial impact outside the limited purpose for which it was

3. In his reply brief, Appellant attempts to recast his argument, in the alternative, as a due process challenge. *See* Reply Brief of Appellant at 12 ("Since the Commonwealth as a prosecuting entity knew that [the jail official's] testimony was false, and there is a reasonable likelihood that had the prosecution revealed the truth about the handbook, the tapes would have been suppressed, Due Process requires a new trial."). However, arguments first raised before an appellate court in a reply brief are not properly considered. *See Commonwealth v. Wharton*, 571 Pa. 85, 105, 811 A.2d 978, 990 (2002). The present circumstances demonstrate good reason for this practice, since Appellant's argument addresses the extent of the prosecutor's knowledge, an inherently factual matter which has not been developed upon an evidentiary record at this juncture.

admitted, namely, to test the scope of Dr. Merikangas' review. *See* N.T. at 1496. In this regard, however, I find it significant that Appellant did not request a limiting instruction to mitigate the possibility of prejudice. *Cf. Commonwealth v. Moore*, 594 Pa. 619, 639–40, 937 A.2d 1062, 1074 (2007) (explaining that potential prejudice may be mitigated by a limiting instruction and deferring any analysis of a trial counsel's performance in failing to request such an instruction to post-conviction review).

As to issue IX, the asserted denial of the right to present mitigating evidence in the form of testimony from Dr. Martone, the majority indicates that Appellant failed to set forth the substance of the testimony he hoped to elicit from Dr. Martone or how such testimony would have been different from that given by Dr. Martone during the guilt phase of trial. *See* Majority Opinion, at 42–43 n. 16, 960 A.2d at 85 n. 16. Appellant, however, does explain:

> the defense proffered that Dr. Martone would have testified that [Appellant] was under the influence of extreme mental and emotional disturbance at the time she saw him in May 2000 and at the time of the commission of the offense. Further, she would have testified that [Appellant's] capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

Brief for Appellant at 56–57. In light of the general proffer going specifically to two statutory mitigating factors, I view this issue as a closer one than the majority, particularly in light of the constitutional norms requiring liberal admission of mitigating evidence. *See, e.g., Tennard v. Dretke*, 542 U.S. 274, 285, 124 S.Ct. 2562, 2570, 159 L.Ed.2d 384 (2004). I agree with the majority, however, that if Dr. Martone's testimony was to be cumulative of that of other defense experts, in the sense that it would not materially add to the weight of the evidence favoring the finding of one or more mitigating circumstances, the trial court's decision to exclude the testimony should be sustained. At least in the absence of a developed record concerning the specifics of what Dr. Martone's testimony would have been, and a fact finder's assessment regarding

the degree of potential impact, there appears to me to be insufficient basis to question the trial court's judgment as to cumulativeness. Notably, in this regard, Appellant did not raise this claim in his post-sentence motions or request a hearing on the matter to develop a factual record.

As to the claim challenging the admission of victim impact evidence (Issue XI), the prosecutor's indication that one facet of the evidence "cannot be written with such detail and emotion as it unfolded in this case" encapsulates the difficulty with this type of evidence and highlights the need for careful control by the trial courts.[4] N.T. at 3080. Given the number of witnesses presented and the passionate character of many of the statements, I find this to be a close case in terms of whether the trial court exceeded its discretion in this regard. I also recognize, however, that the Constitution does not foreclose evidence of the harm caused by the defendant in capital sentencing proceedings, *see Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), and Appellant caused an immeasurable amount of harm. Thus, although I agree with the majority that no relief is due here, given that we are seeing fairly wide differences across cases in terms of the degree of control exercised by the trial courts over the development of victim impact evidence, I believe that the Court would be well advised to consider exercising its rulemaking function to impose some structural limitations.

Justice TODD, Concurring.

I join in the thorough and thoughtful majority opinion except for the issues raised herein, as I agree with the majority's conclusion that Appellant Richard Baumhammers is entitled to no relief, as to either his conviction or his sentence of death. I write separately because my reasoning differs from the majority's as to several of the issues Baumhammers raises.

---

4. It is well established that the application of the death penalty is to be based on reasoned moral judgment, *see Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989), as opposed to passion or emotion.

First, as to Baumhammers' argument that the Common-wealth violated the Wiretap Act in recording his telephone conversations with his parents while he was incarcerated awaiting trial, I agree with the result reached by Justice McCaffery, but on narrower grounds. *See* Majority Op. at 28–30, 960 A.2d at 76–80. I would explicitly adopt the parsing of the relevant statute by the trial judge, the Honorable Jeffery A. Manning: that a written notification to inmates is neces-sary only upon *a facility's implementation* of a policy of wiretapping inmate phone calls. Trial Ct. Op., 12/29/05, at 14; *see* 18 Pa.C.S.A. § 5704(14)(i)(A). Accordingly, I conclude Baumhammers was not entitled to written notification, and the aural notification he was provided was adequate to satisfy the statutory requirements. *See Chimenti v. Pa. Dep't of Correc-tions,* 720 A.2d 205 (Pa.Cmwlth.1998) (concluding in *dicta* Section 5704 requires written notice when that section is implemented).

Next, on several of the issues Baumhammers raises, I would begin and end with waiver. First, Baumhammers asserts the trial court erred in not granting him a change of venue or venire; his trial counsel, however, specifically opposed either suggestion when raised by the trial court. *See* Majority Op. at 23–29, 960 A.2d at 73–76. Accordingly, this argument is waived for purposes of direct appeal. Second, Baumhammers asserts the trial court erred in not excluding particular victim impact evidence, *see* Majority Op. at 54–58, 960 A.2d at 92–94; however, his trial counsel did not specifically object to the introduction of testimony from any of the particular victims. Accordingly, this argument is also waived for purposes of direct appeal. Third, Baumhammers asserts that his rights under the Confrontation Clause, in light of *Crawford v. Wash-ington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), were violated when Dr. Michael Welner testified about conver-sations regarding Baumhammers which Dr. Welner had with a variety of non-testifying individuals. *See* Majority Op. at 58–60, 960 A.2d at 94–96. Again, Baumhammers' trial counsel did not object at trial, and so this argument is waived for purposes of direct appeal. Nevertheless, in each of these instances, the majority continues on to address the merits of the waived

claims. Consistent with *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 736–37 (2002), any discussion of the underlying legal support—or lack thereof—for these arguments beyond a finding of waiver is *dicta*, and is better conducted, if necessary, on collateral appeal. With limited exception, under *Grant*, we foreclose a prisoner on direct appeal from recasting waived claims in terms of counsel's ineffectiveness, requiring such appellant to defer such claims until collateral appeal, no matter how potentially meritorious. As a corollary, we ought similarly to resist discussion of the merits of such claims on direct appeal, as our discussion could prejudice the collateral appeal courts' proper consideration of the relevant issues.

Finally, I address Baumhammers' claim that his execution is barred by the Eighth Amendment's preclusion of cruel and unusual punishment because he is afflicted with a serious mental illness. I agree with Justice McCaffery that Baumhammers' claim fails, *see* Majority Op. at 61–64, 960 A.2d at 96–98, but write separately to express my grave concern about the issue.[1]

Initially, it is clear Baumhammers merits no sympathy. As the majority summarizes in detail, Majority Op. at 13–23, 960 A.2d at 67–72, he committed vicious hate crimes, targeting people of African–American, Asian, and Jewish descent. He defaced synagogues, targeted businesses and places of worship catering to members of particular ethnic groups, killed five people, and paralyzed one. Our streets are safer because he is no longer on them.

However, distinct from the question of whether Baumhammers is dangerous or evil is the question of whether he may, consistent with the Eighth Amendment, be subjected to capital punishment. Baumhammers argues he may not be executed based on *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), wherein the United States Supreme

---

1. I recognize we lack detailed advocacy on the issue, as Baumhammers argues only that "the *Atkins* decision should and will be extended to individuals, like him, who are mentally ill." Brief for Appellant at 85. Moreover, I note Baumhammers raises no claims under Article I, Section 13 of the Pennsylvania Constitution. However, I am convinced this recurring issue deserves further consideration by legislators and jurists.

Court held that prisoners who, at the time they committed their crimes, suffered from mental retardation could not be executed for those crimes. He avers that individuals with serious mental illnesses are so similar to the mentally retarded that *Atkins* requires a similar *per se* ban on their execution. He argues it is constitutionally inadequate merely to permit the mentally ill to argue their mental illness constitutes a mitigating factor at sentencing, as is presently allowed.[2]

The evidence that Baumhammers suffers from a serious mental illness is ample. Uncontroverted evidence indicates he was institutionalized in 1993 and 1999 for severe mental illness; was unable to hold a steady job because of his mental illness; hallucinated at his admission to the Georgia state bar that individuals were harassing him and calling him names; believed the FBI, CIA, and Mossad were trying to kill him; and refused to take out the garbage, asserting that when he did so people shot at him with lasers. He unsuccessfully attempted treatment with an alphabet of psychotropic medications, including Anafranil, Ativan, Cogentin, Haldol, Inderal, Luvox, Norphronin, Paxil, Prozac, Risperdol, Seroquel, Trilafon, Zoloft, and Zyprexa. Shortly after the crime, Baumhammers was diagnosed by Dr. Christine Martone with paranoid schizophrenia and auditory hallucinations. *See* Majority Op. at 42, 960 A.2d at 84. Psychiatric witnesses including Dr. Welner, the Commonwealth's expert, testified that Baumhammers suffered from persecutory delusions (Dr. James Merikangas, N.T. 9/4/01, at 1431; Dr. Philip Ninan, *id.* at 1544; Dr. Edward Friedman, *id.* at 1587; Dr. Matcheri Keshavan, N.T. 9/5/01, at 1636; Dr. Welner, N.T. 9/6/01, at 1936); paranoid schizophrenia (Dr. Martone, *id.* at 1791, 1799; Dr. Laszlo Petras, *id.* at 1866); and schizo-affective disorder and depression (Dr. Soroya Radfar, N.T. 9/5/01, at 1739–41). Moreover, the Commonwealth concedes in its brief Baumhammers was delusional. Brief for the Commonwealth at 84. Consequent-

2. Pennsylvania follows the Model Penal Code in allowing mental illness to be argued in mitigation. 42 Pa.C.S.A. § 9711(e)(2); MPC § 210.6(4)(b).

ly, sufficient evidence was presented at trial to demonstrate Baumhammers' serious mental illness.

Our legal system struggles with how to fairly allocate criminal liability and criminal punishment to individuals whose mental illness leaves them with diminished capacity for moral decision-making. Some defendants, we recognize, are so impaired in this regard that to assign any criminal liability to them would be inequitable. In those cases, the law requires a verdict of not guilty by reason of insanity. *See* 18 Pa.C.S.A. § 315. Other defendants are less impaired but still impaired enough that the opprobrium of a conviction should be mitigated by a recognition of their condition. In those cases, the law requires a verdict of guilty but mentally ill. *See* 18 Pa.C.S.A. § 314.[3] Within this latter category, Baumhammers now suggests a further refinement: certain mental illnesses which are so impairing to every person afflicted with them that such a person cannot be culpable enough to merit capital punishment (though, as in *Atkins* and *Roper*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), a life sentence without the possibility of parole would remain constitutionally permissible).

As the Majority notes, there is controlling precedent from our Court on this issue. *Commonwealth v. Faulkner*, 528 Pa. 57, 75–76, 595 A.2d 28, 38 (1991). In *Faulkner*, we held that the Eighth Amendment did not preclude the execution of prisoners who were mentally ill at the time of the crime. However, the great principle of *stare decisis* is less powerful in the Eighth Amendment context, since the "national consensus" the Eighth Amendment requires is by definition temporally situated. *See Atkins*, 536 U.S. at 311, 122 S.Ct. 2242 ("A claim that punishment is excessive is not judged by the standards that prevailed in 1685 when Lord Jeffreys presided over the 'Bloody Assizes' or when the Bill of Rights was adopted, but rather by those that *currently* prevail" (italics supplied)); *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2

**3.** We recently noted the difficult distinctions between defendants who are not guilty by reason of insanity and those who are guilty but mentally ill. *Commonwealth v. Rabold*, 597 Pa. 344, 951 A.2d 329 (2008).

L.Ed.2d 630 (1958) (noting that the Eighth Amendment is governed by "the evolving standards of decency that mark the progress of a maturing society"). In *Atkins,* the Supreme Court overturned a 13–year–old precedent, *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (holding that the Eighth Amendment does not bar the execution of prisoners who were mentally retarded at the time they committed their offenses). In *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Court held the execution of prisoners who were under 18 at the time of their crimes was barred by the Eighth Amendment. In so doing, the Court overturned a 16–year–old precedent, *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (holding that the Eighth Amendment does not bar the execution of prisoners who were under 18 years of age at the time they committed their offenses). Both decisions were based on changes in the factors which, taken together, determine the existence of a national consensus. Accordingly, I believe we may re-examine *Faulkner* in light of contemporary standards to effectuate the protections afforded by our national charter.

A group of offenders may be excluded from capital punishment under the Eighth Amendment only if a national consensus barring the execution of such offenders exists. The United States Supreme Court has set out four indicia to consider in determining the existence of such a consensus: (1) legislation enacted by the country's legislatures, including whether there is a pattern of movement towards precluding the execution of members of a particular group; (2) the decisions of sentencing juries, appellate courts, and governors about whether to execute defendants in that group; (3) where appropriate, other indicia of national and international opinion; and (4) the court's own judgment. *See Roper,* 543 U.S. at 563–65, 125 S.Ct. 1183 (2005). In such cases, though capital punishment usually must be "sensible to the uniqueness of the individual," *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and "tailored to his personal responsibility and moral guilt," *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), a national consensus may develop which holds that an immutable characteristic

of the defendant so affects his individual responsibility and moral guilt that it precludes finding his "consciousness [is] materially more 'depraved' than that of any person guilty of murder," as is required for capital punishment to be lawful. *See Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In such circumstances, our high Court holds that a defendant's execution is barred.

Under the United States Supreme Court's Eighth Amendment jurisprudence, I agree that Baumhammers cannot meet the *Atkins/Roper* test on the basis of the record before us. While there is some disagreement within our high Court, it is reasonably clear that an offender seeking to satisfy the first factor of *Atkins* and *Roper,* which focuses on legislative action, must show, at least, that a majority of jurisdictions bar the execution of members of his group and the "direction of change" is consistent and in favor of barring the execution of members of his group. *See Atkins,* 536 U.S. at 315, 122 S.Ct. 2242. To satisfy the second factor, he must additionally show that juries impose capital punishment on members of his group exceedingly rarely. *See Roper,* 543 U.S. at 563–65, 125 S.Ct. 1183; *Thompson v. Oklahoma,* 487 U.S. 815, 833, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality) (concluding that where only five offenders under the age of 16 had been among the 1,400 defendants sentenced to death nationwide between 1982 and 1986, their sentences had been "cruel and unusual in the same way that being struck by lightning is cruel and unusual"). Critically, Baumhammers does not attempt to demonstrate any of these propositions apply to paranoid schizophrenics, and he has not introduced any evidence which would suggest the existence of such a national consensus.

Moreover, Baumhammers conceded at oral argument that the factors laid out in *Atkins* and *Roper* are not present here. In his brief, he provided only a cursory argument that *Atkins* should apply directly to the seriously mentally ill without any evidence demonstrating legislative action against the execution of seriously mentally ill defendants,[4] diminished imposition of

4. Research has revealed only one state, Connecticut, which has imposed such a restriction. *See* Conn. Gen.Stat. Ann. § 53a–46a(h).

the death penalty on seriously mentally ill defendants,[5] support from national and international opinion, or guidance for the exercise of this Court's independent judgment.[6] Accordingly, in this case, I join Justice McCaffery's conclusion on the issue.

Nonetheless, I concur with the opinions expressed by Justice Evelyn Lundberg–Stratton of the Ohio Supreme Court, that the similarities between individuals with severe mental illness and those with mental retardation or juvenile status are strong enough to justify serious consideration by the country's legislatures. *See Ketterer*, 111 Ohio St.3d 70, 855 N.E.2d 48, 81–87 (2006) (Lundberg–Stratton, J., concurring). As Justice Lundberg–Stratton emphasized, as with mentally retarded defendants, it is not clear that either purpose of capital punishment—retribution or deterrence—is served by imposing that punishment on defendants who are severely mentally ill at the time of their crimes. *Id.* at 85, 855 N.E.2d 48; *see also State v. Nelson*, 173 N.J. 417, 803 A.2d 1, 47 (2002) (Zazzali, J., concurring); *Corcoran v. State*, 774 N.E.2d 495, 502 (Ind.2002) (Rucker, J., dissenting).

**5.** To the extent data is available, it may be read to indicate the percentage of mentally ill defendants on death row is increasing, not decreasing. *See* National Mental Health Association, Death Penalty & People with Mental Illnesses (2006), http://www1.nmha.org/position/deathPenalty/deathpenalty.cfm. This data is not conclusive, since NMHA does not explicitly state whether it is studying only offenders who were mentally ill at the time of the crime or including offenders who become mentally ill on death row. It is beyond cavil that a prisoner who is suffering from a severe mental illness that makes him unable to understand the reasons he is being put to death may not be executed. *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (noting that prohibition dates to medieval English common law); *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

**6.** Federal courts have consistently declined to extend *Atkins* to the mentally ill. *See, e.g., In re Neville*, 440 F.3d 220, 221 (5th Cir.2006) (citing *In re Woods*, 155 Fed.Appx. 132, 136 (5th Cir.2005)); *Joshua v. Adams*, 231 Fed.Appx. 592, 593 (9th Cir.2007); *Green v. Quarterman*, 2008 WL 442356 (S.D.Tx.2008). Our neighboring state courts, too, have concluded *Atkins* does not apply to the seriously mentally ill. *State v. Ketterer*, 111 Ohio St.3d 70, 855 N.E.2d 48 (2006); *Matheney v. State*, 833 N.E.2d 454 (Ind.2005) (holding that permitting a defendant to argue mental illness constitutes a mitigating factor at his penalty phase hearing provides adequate protection).

In both *Atkins* and *Roper,* the Supreme Court described in some detail the characteristics which rendered members of the group in question constitutionally exempt from capital punishment—the mentally retarded and juveniles, respectively. Justice Stevens noted that mentally retarded offenders:

> [F]requently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Atkins,* 536 U.S. at 318, 122 S.Ct. 2242 (footnotes omitted). Accordingly, Justice Stevens concluded, "the lesser culpability of the mentally retarded offender surely does not merit" a punishment reserved for the most culpable adult offenders. *Id.* at 319, 122 S.Ct. 2242.

In *Roper,* Justice Kennedy emphasized three primary differences between adolescents and adults: first, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions"; second, the fact that "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and finally, the fact that "the character of a juvenile is not as well formed as that of an adult." *Roper,* 543 U.S. at 569–570, 125 S.Ct. 1183.

Serious mental illnesses have similar effects. *See* Christopher Slobogin, *What Atkins Could Mean for People with Mental Illness,* 33 N.M. L.Rev. 293 (2003) (arguing the effects of mental retardation and serious mental illness are so similar as to eliminate a rational basis for distinguishing between the

two categories of defendants); *see, e.g.,* National Institute of Mental Health, *Schizophrenia,* available at http://www.nimh. nih.gov/health/publications/schizophrenia/ complete-publication.shtml (noting that schizophrenics struggle to absorb and interpret information and make decisions based on that information).

An individual with a serious mental illness may be just as seriously impaired in his ability to "understand and process information" as an individual with a diminished IQ or an individual who has not yet reached the age of legal majority. Moreover, while mental illness is no more an unavoidable cause of criminal conduct than mental retardation or being a juvenile, its manifestations—such as the delusions that accompany paranoid schizophrenia—hamper a sufferer's ability to "engage in logical reasoning," and the disconnect between a paranoid schizophrenic's basic understanding of the world around him and that of an individual not similarly afflicted will make it difficult for the schizophrenic to understand others' reactions. *Compare Atkins, supra* (holding that similar characteristics of the mentally retarded made them categorically ineligible for capital punishment).[7]

Moreover, several national organizations have taken positions against the execution of the severely mentally ill. *See*

**7.** An independent judicial examination of the culpability of individuals with serious mental illnesses, and the constitutional propriety of their execution for crimes as indubitably heinous as Baumhammers', is well within the traditional parameters of the Eighth Amendment. *See Coker v. Georgia,* 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) ("the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment"); *Roper,* 543 U.S. at 565, 125 S.Ct. 1183 (interpreting *Coker* to require the Court to independently consider the appropriateness of executing members of a particular group). This factor does not subordinate the democratic will to the mere *"feelings* and *intuitions* of a majority of the Justices" on a particular court, *Atkins,* 536 U.S. at 348, 122 S.Ct. 2242 (Scalia, J., dissenting) (italics in original), but requires that judges make a reasoned attempt to interpret and apply that Amendment's prohibition on "cruel" punishments. Not to make such an attempt would be to abdicate our proper judicial role. *See id.* at 349, 122 S.Ct. 2242 (noting that certain punishments, "such as the rack and the thumbscrew," are always-and-everywhere cruel and so precluded by the Eighth Amendment).

*Recommendations of the American Bar Association Section of Individual Rights and Responsibilities Task Force on Mental Disability and the Death Penalty,* 54 Cath. U.L.Rev. 1115, § 2 (2005); Public Policy Platform of the National Alliance on Mental Illness, §§ 9.7.1.1, 9.7.1.2 (8th Ed.2006); Mental Health America, *Position Statement 54: The Death Penalty and People with Mental Illnesses,* available at ht tp:// www.nmha.org/go/position-statements/54.[8]

However, despite my grave concerns, I decline to go beyond what *Atkins* and *Roper* require on the record in this case. Accordingly, as did Justice Lundberg–Stratton, I request that our legislature consider the issue, summon and question scientific experts (which an appellate court may not do), and consider whether the national consensus and our statutory law are in line with the demands of the Eighth Amendment and of fundamental fairness, considering the best scientific evidence of the impact of severe mental illnesses on individual culpability.[9]

8. The views of such organizations may evidence a "broader social and professional consensus" that the execution of members of a certain group is unacceptable. *See Atkins,* 536 U.S. at 316 n. 21, 122 S.Ct. 2242 (citing the positions of, *inter alia,* the American Psychiatric Association and American Catholic Conference that the execution of the mentally retarded is cruel and unusual).

9. Naturally, such an analysis will also require consideration of Article I, § 13 of the Pennsylvania Constitution.